Christopher R. Pitoun (SBN 290235)
HAGENS BERMAN SOBOL SHAPIRO LLP
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice forthcoming*)
Michella A. Kras (*pro hac vice forthcoming*)
E. Tory Beardsley (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Facsimile: (602) 840-3012
Email: rob@hbsslaw.com
michellak@hbsslaw.com
toryb@hbsslaw.com

*Counsel for Plaintiffs*

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

WESTERN DIVISION

| | |
|---|---|
| HANNAH HOWELL, BRIGETTE LOWE, ROBIN EISMAN, KERI LYNCH, KATHRYN KESSINGER, HOLLIE SHADD, ASHLEY PRICE-HORTON, GAYANNA LYNNE RULE, JINNY HAGER, KIMBRELLE RODGERS, DENISE SMITH, KATELYN DIAS, DEANNA HARRELL, LAUREN CARR, KERRI PARKER, ALIKI MARINOS, LYNETTE ARMSTRONG, JAKE TULOGESKI, MARK GEIS, KELLY DUGAS, JULIE DZIEKAN, ERIN COYLE, LEILA MELLO, KIMBERLY | Case No. ____________<br><br>**CLASS ACTION COMPLAINT**<br><br>DEMAND FOR JURY TRIAL |

WEATHERBEE, KRISTY CREECH, KIM DAVIS, ISABELLE SALHANI, TERASA ROWE, SUSAN VEACH, AND ANTHONY FRANCESCONI, individually and on behalf of themselves and all others similarly situated,

Plaintiffs,

v.

JOHN PAUL MITCHELL SYSTEMS,

Defendant.

# TABLE OF CONTENTS

**Page**


I. INTRODUCTION ........ 1

II. PARTIES ........ 3

III. JURISDICTION AND VENUE ........ 5

IV. FACTS ........ 7

- A. History of JPMS ........ 7
- B. JPMS's "Cruelty Free" Promise ........ 9
- C. Animal Testing in the Cosmetic Industry ........ 23
- D. Consumers' Attitudes Toward Animal Testing ........ 26
- E. Regulations on Animal Testing for Cosmetics in the U.S. and Globally ........ 27
- F. Beauty Industry in China ........ 31
- G. JPMS and the Chinese Market ........ 43
- H. Plaintiffs ........ 55

V. CLASS ACTION ALLEGATIONS ........ 78

- A. The Requirements of Rule 23(a)(1)-(4) Are Satisfied ........ 82
  - 1. Numerosity ........ 82
  - 2. Commonality ........ 82
  - 3. Typicality ........ 83
  - 4. Adequacy ........ 83
- B. The Requirements of Rule 23(b)(3) are Satisfied ........ 84
  - 1. Predominance ........ 84
  - 2. Superiority ........ 84

VI. TOLLING OF STATUTE OF LIMITATIONS ........ 85

VII. COUNTS ........ 86

- A. Arizona Causes of Action for Arizona Class Alleged by Plaintiff Hannah Howell ("Arizona Plaintiff") ........ 86

COUNT I CONSUMER FRAUD ACT ARIZ. REV. STAT. § 44-1521 *et seq.* .......... 86

B. California Causes of Action Alleged by Plaintiffs Robin Eisman, Keri Lynch, Brigette Lowe, Jinny Hager, Terasa Rowe, Lynette Armstrong, and Isabelle Salhani ("California Plaintiffs") .......... 88

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE CALIFORNIA UNIFORM COMMERCIAL CODE .......... 88

COUNT II VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CLRA) CAL. CIV. CODE § 1750, *et seq.* .......... 89

COUNT III VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW CAL. BUS. & PROF. CODE § 17500, *et seq.* .......... 91

COUNT IV VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW CAL. BUS. & PROF. CODE § 17200, *ET SEQ.* .......... 93

C. Colorado Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("Colorado Plaintiff") .......... 95

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE COLORADO UNIFORM COMMERCIAL CODE .......... 95

COUNT II COLORADO CONSUMER PROTECTION ACT ("Colorado CPA") .......... 96

D. Florida Causes of Action Alleged by Plaintiffs Gayanna Lynne Rule, Mark Geis, and Kimberly Weatherbee ("Florida Plaintiffs") .......... 99

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE FLORIDA UNIFORM COMMERCIAL CODE .......... 99

COUNT II FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT ("Florida DUTPA") .......... 100

E. Georgia Causes of Action Alleged by Plaintiffs Lynette Armstrong, Erin Coyle, and Terasa Rowe ("Georgia Plaintiffs") .......... 102

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE GEORGIA UNIFORM COMMERCIAL CODE .......... 102

COUNT II GEORGIA FAIR BUSINESS PRACTICES ACT ("Georgia FBPA") .......... 103

F. Hawaii Causes of Action Alleged by Plaintiff Mark Geis ("Hawaii Plaintiff") .......... 106

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE HAWAII UNIFORM COMMERCIAL CODE .......... 106

COUNT II HAWAII UNFAIR DECEPTIVE ACTS OR PRACTICES ("Hawaii UDAP") .......... 107

G. Idaho Causes of Action Alleged by Plaintiffs Susan Veach and Anthony Francesconi ("Idaho Plaintiffs") ........ 109

COUNT I IDAHO CONSUMER PROTECTION ACT ("Idaho CPA") ........ 109

H. Illinois Causes of Action Alleged by Plaintiffs Lauren Carr and Aliki Marinos ("Illinois Plaintiffs") ........ 111

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE ILLINOIS UNIFORM COMMERCIAL CODE ........ 111

COUNT II ILLINOIS DECEPTIVE TRADE PRACTICES ACT ("Illinois DTPA") ........ 112

I. Indiana Causes of Action Alleged by Plaintiff Kathryn Kessinger ("Indiana Plaintiff") ........ 115

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE INDIANA UNIFORM COMMERCIAL CODE ........ 115

COUNT II INDIANA DECEPTIVE CONSUMER SALES ACT ("Indiana DCSA") ........ 116

J. Massachusetts Causes of Action Alleged by Plaintiffs Kelly Dugas, Leila Mello, and Kimberly Weatherbee ("Massachusetts Plaintiffs") ........ 119

COUNT I MASSACHUSETTS CONSUMER PROTECTION ACT ("Massachusetts CPA") ........ 119

K. Michigan Causes of Action Alleged by Plaintiff Lauren Carr ("Michigan Plaintiff") ........ 122

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE MICHIGAN UNIFORM COMMERCIAL CODE ........ 122

COUNT II MICHIGAN CONSUMER PROTECTION ACT ("Michigan CPA") ........ 123

L. Minnesota Causes of Action Alleged by Plaintiff Kim Davis ("Minnesota Plaintiff") ........ 125

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE MINNESOTA UNIFORM COMMERCIAL CODE ........ 125

COUNT II MINNESOTA UNLAWFUL TRADE PRACTICES ACT ("Minnesota UTPA") ........ 126

M. Nevada Causes of Action Alleged by Plaintiffs Hannah Howell and Susan Veach ("Nevada Plaintiffs") ........ 128

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE NEVADA UNIFORM COMMERCIAL CODE ........ 128

COUNT II NEVADA DECEPTIVE TRADE PRACTICES ACT ("Nevada DTPA") ........ 129

N. New Hampshire Causes of Action Alleged by Plaintiff Kimberly Weatherbee ("New Hampshire Plaintiff") ... 131

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE NEW HAMPSHIRE UNIFORM COMMERCIAL CODE ... 131

COUNT II NEW HAMPSHIRE CONSUMER PROTECTION ACT ("New Hampshire CPA") ... 132

O. New Jersey Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("New Jersey Plaintiff") ... 135

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE ... 135

COUNT II NEW JERSEY UNFAIR TRADE PRACTICES ACT ("New Jersey UTPA") ... 136

P. North Carolina Causes of Action Alleged by Plaintiff Kristy Creech ("North Carolina Plaintiff") ... 138

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE NORTH CAROLINA UNIFORM COMMERCIAL CODE ... 138

COUNT II NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT ("North Carolina UDPA") ... 139

Q. Ohio Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("Ohio Plaintiff") ... 141

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE OHIO UNIFORM COMMERCIAL CODE ... 141

COUNT II OHIO CONSUMER SALES PRACTICES ACT ("Ohio CSPA") ... 142

R. Oklahoma Causes of Action Alleged by Plaintiff Terasa Rowe ("Oklahoma Plaintiff") ... 145

COUNT I OKLAHOMA CONSUMER PROTECTION ACT ("Oklahoma CPA") ... 145

S. Oregon Causes of Action Alleged by Plaintiffs Hannah Howell and Anthony Francesconi ("Oregon Plaintiffs") ... 147

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE OREGON UNIFORM COMMERCIAL CODE ... 147

COUNT II OREGON UNLAWFUL TRADE PRACTICES ACT ("Oregon UTPA") ... 148

T. Pennsylvania Causes of Action Alleged by Plaintiffs Hollie Shadd and Ashley Price-Horton ("Pennsylvania Plaintiffs") ... 150

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE PENNSYLVANIA UNIFORM COMMERCIAL CODE ... 150

COUNT II PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("Pennsylvania UTPCPL") ..... 152

U. Rhode Island Causes of Action Alleged by Plaintiff Kimberly Weatherbee ("Rhode Island Plaintiff") ..... 154

COUNT I RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT ("Rhode Island DTPA") ..... 154

V. South Carolina Causes of Action Alleged by Plaintiff Kimbrelle Rodgers ("South Carolina Plaintiff") ..... 157

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE SOUTH CAROLINA UNIFORM COMMERCIAL CODE ..... 157

W. Tennessee Causes of Action Alleged by Plaintiffs Katelyn Dias and Deanna Harrell ("Tennessee Plaintiffs") ..... 158

COUNT I TENNESSEE CONSUMER PROTECTION ACT ("Tennessee CPA") ..... 158

COUNT II UNJUST ENRICHMENT (IN THE ALTERNATIVE) ..... 160

X. Texas Causes of Action Alleged by Plaintiffs Hannah Howell, Gayanna Lynne Rule, and Mark Geis ("Texas Plaintiffs") ..... 161

COUNT I TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("Texas DTPA") ..... 161

Y. Utah Causes of Action Alleged by Plaintiffs Denise Smith and Kerrie Parker ("Utah Plaintiffs") ..... 164

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE UTAH UNIFORM COMMERCIAL CODE ..... 164

COUNT II UTAH CONSUMER SALES PRACTICES ACT ("Utah CSPA") ..... 165

Z. Virginia Causes of Action Alleged by Plaintiff Isabelle Salhani ("Virginia Plaintiff") ..... 167

COUNT I BREACH OF EXPRESS WARRANTY UNDER THE VIRGINIA UNIFORM COMMERCIAL CODE ..... 167

COUNT II VIRGINIA CONSUMER PROTECTION ACT ("Virginia CPA") ..... 168

AA. Wisconsin Causes of Action Alleged by Plaintiffs Jake Tulogeski, Mark Geis, and Julie Dziekan ("Wisconsin Plaintiffs") ..... 170

COUNT I WISCONSIN UNFAIR TRADE PRACTICES ACT ("Wisconsin UTPA") ..... 170

PRAYER FOR RELIEF ..... 172

DEMAND FOR JURY TRIAL ..... 173

# I. INTRODUCTION

1. When a company makes promises or statements about its products, consumers should be able to trust those promises and statements.

2. The law honors this truism and in fact goes even further. When a company makes factual statements and has written promises on its products, the law deems those statements and promises to be part of the contract between the parties, and it protects consumers if the product fails to meet the promises or is not as stated on the label.

3. Defendant John Paul Mitchell Systems ("JPMS") was founded on the principle that it would never test on animals, promising: "Never have. Never will." Since 1980, JPMS has publicized and reinforced this sentiment with its customers, always expressly emphasizing that its hair-care products were never tested on animals. JPMS went even further, actively publicly advocating against animal testing in the cosmetics industry and seeking, through legislation, to punish those who tested on animals.

4. JPMS's promise that its products were never tested on animals can be found on every product it sells, as well as in all its other media, publicity, and public-relation materials, including advertisements, website, marketing campaigns, interviews, and press releases. Over the years, John Paul Mitchell Systems' product labels have promised in various ways and words that its products are 100% cruelty free. Those promises include: "Never Animal Tested"; "No Animal Testing"; "A Pioneer in Cruelty-Free Hair Care"; and "John Paul Mitchell Systems does not conduct or endorse animal testing."

5. Yet, despite founding its company on the principle that it would never test on animals, repeating that promise for over 40 years, and seeking to change California law to punish those who test on animals, JPMS prioritized its profits over its principles. JPMS has not honored its promises, allowing animal testing on numerous products just to gain access to one of the world's biggest consumer marketplaces, China.

6. JPMS claimed it never has and never will test on animals anywhere in the world, and in particular in China. While portraying itself in the United States as an animal rights pioneer, JPMS opted to sell its products in China where testing on animals was mandatory for companies like JPMS during the Class period. *See infra*.

7. When a company agrees to perform animal testing to gain access to the Chinese market—while claiming the opposite in advertising, to the public, and on every product that it sells—consumers who purchased products with false representations about the characteristics of the products are harmed.

8. Because the marketplace disdains cosmetic products affiliated with animal testing, the members of the Class were damaged at the point of sale by overpaying for cosmetics that were in fact actually tested on animals despite assurances on the product stating otherwise.

9. Consequently, Plaintiffs bring this as a class action on behalf of purchasers of any JPMS hair-care products. Plaintiffs seek damages for breach of express warranty under the Uniform Commercial Code and state consumer protection acts.

## II. PARTIES

10. Plaintiff Hannah Howell is a resident of Portland, Oregon, who purchased JPMS hair-care products in Arizona, Oregon, Nevada, and Texas.

11. Plaintiff Brigette Lowe is a resident of Bethel Island, California, who purchased JPMS hair-care products in California.

12. Plaintiff Robin Eisman is a resident of San Juan Capistrano, California, who purchased JPMS hair-care products in California.

13. Plaintiff Keri Lynch is a resident of San Diego, California, who purchased JPMS hair-care products in California.

14. Plaintiff Kathryn Kessinger is a resident of Jeffersonville, Indiana, who purchased JPMS hair-care products in Indiana.

15. Plaintiff Hollie Shadd is a resident of Irwin, Pennsylvania, who purchased JPMS hair-care products in Pennsylvania.

16. Plaintiff Ashley Price-Horton is a resident of Havertown, Pennsylvania, who purchased JPMS hair-care products in Pennsylvania.

17. Plaintiff Gayanna Lynne Rule is a resident of Westcliffe, Colorado, who purchased JPMS hair-care products in Colorado, Florida, Ohio, New Jersey, and Texas.

18. Plaintiff Jinny Hager is a resident of Solvang, California, who purchased JPMS hair-care products in California.

19. Plaintiff Kimbrelle Rodgers is a resident of Batesburg, South Carolina, who purchased JPMS hair-care products in South Carolina.

20. Plaintiff Denise Smith is a resident of Salt Lake City, Utah, who purchased JPMS hair-care products in Utah.

21. Plaintiff Katelyn Dias is a resident of Cleveland, Tennessee, who purchased JPMS hair-care products in Tennessee.

22. Plaintiff Deanna Harrell is a resident of Knoxville, Tennessee, who purchased JPMS hair-care products in Tennessee.

23. Plaintiff Lauren Carr is a resident of Chicago, Illinois, who purchased JPMS hair-care products in Illinois and Michigan.

24. Plaintiff Kerri Parker is a resident of Ogden, Utah, who purchased JPMS hair-care products in Utah.

25. Plaintiff Aliki Marinos is a resident of Glenview, Illinois, who purchased JPMS hair-care products in Illinois.

26. Plaintiff Lynette Armstrong is a resident of Griffin, Georgia, who purchased JPMS hair-care products in California and Georgia.

27. Plaintiff Jake Tulogeski is a resident of Appleton, Wisconsin, who purchased JPMS hair-care products in Wisconsin.

28. Plaintiff Mark Geis is a resident of Eagle River, Wisconsin, who purchased JPMS hair-care products in Florida, Hawaii, Texas, and Wisconsin.

29. Plaintiff Kelly Dugas is a resident of Waltham, Massachusetts, who purchased JPMS hair-care products in Massachusetts.

30. Plaintiff Julie Dziekan is a resident of West Allis, Wisconsin, who purchased JPMS hair-care products in Wisconsin.

31. Plaintiff Erin Coyle is a resident of Cornelia, Georgia, who purchased JPMS hair-care products in Georgia.

32. Plaintiff Leila Mello is a resident of Fall River, Massachusetts, who purchased JPMS hair-care products in Massachusetts.

33. Plaintiff Kimberly Weatherbee is a resident of Hyde Park, Massachusetts, who purchased JPMS hair-care products in Florida, Massachusetts, New Hampshire, and Rhode Island.

34. Plaintiff Kristy Creech (formerly Bennett) is a resident of East Bend, North Carolina, who purchased JPMS hair-care products in North Carolina.

35. Plaintiff Kim Davis is a resident of Savage, Minnesota, who purchased JPMS hair-care products in Minnesota.

36. Plaintiff Isabelle Salhani is a resident of Chicago, Illinois, who purchased JPMS hair-care products in California, and Virginia.

37. Plaintiff Terasa Rowe is a resident of Augusta, Georgia, who purchased JPMS hair-care products in California, Georgia, and Oklahoma.

38. Plaintiff Susan Veach is a resident of Mesquite, Nevada, who purchased JPMS hair-care products in Idaho and Nevada.

39. Plaintiff Anthony Francesconi is a resident of La Grande, Oregon, who purchased JPMS hair-care products in Idaho and Oregon.

40. JPMS was registered on March 31, 1980, as a California corporation. Its principal place of business is at 20705 Centre Pointe Parkway, Santa Clarita, CA, 91350.

## III. JURISDICTION AND VENUE

41. This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332(d)(2) because at least one class member is of diverse citizenship from Defendant, there are over 100 class members, and upon information and belief, the aggregate amount in controversy exceeds $5,000,000.

42. This Court has personal jurisdiction over Plaintiff Robin Eisman because she is a resident of this District.

43. This Court has personal jurisdiction over Plaintiff Jinny Hager because she is a resident of this District and Division of the District.

44. The Court has personal jurisdiction over the remaining Plaintiffs because they submit to this Court's jurisdiction.

45. This Court has personal jurisdiction over JPMS because it is a California corporation, its principal place of business is in this District and Division of the District, and it has conducted and continues to conduct business in California and in this District.

46. Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because JPMS resides in this District and the events that gave rise to the claims occurred in substantial part in this District.

47. Upon information and belief, JPMS developed, determined, and disseminated its cruelty-free claims at and from its headquarters in California.

48. Upon information and belief, all marketing and advertising decisions related to JPMS's cruelty-free claims were made and disseminated from its headquarters in California.

49. Upon information and belief, JPMS developed and determined the cruelty-free labels, promises, representations, and logos placed on all of its products from its headquarters in California.

50. Upon information and belief, JPMS solicited salons and distributors across the country to sell and promote its cruelty-free hair-care products from its headquarters in California.

51. Upon information and belief, JPMS decides which companies can sell its products and requires each third-party seller to be an authorized retailer from its headquarters in California.

52. Upon information and belief, all decisions related to JPMS's cruelty-free claims were made at and disseminated from its headquarters in California, including its decision to sell products in China, which required animal testing, while simultaneously telling its consumers it was not testing in China.

## IV. FACTS

### A. History of JPMS

53. JPMS is a manufacturer of professional hair-care products.

54. In 1980, Paul Mitchell ("Mitchell") and John Paul DeJoria ("DeJoria") founded Paul Mitchell Systems, Inc. in California, which was later changed to John Paul Mitchell Systems.

55. Mitchell was a well-known hair stylist, whose work was featured in major fashion magazines.

56. DeJoria worked in the beauty products industry, holding several sales positions with Redken Haircare Products.

57. Mitchell and DeJoria decided to combine their industry knowledge to form a company that would "provide luxury hair care at an affordable price."[1]

---

[1] Our Story, PAUL MITCHELL, https://web.archive.org/web/20230320161717/https://www.paulmitchell.com/company (last visited Feb. 11, 2026); Our Story, PAUL MITCHELL SCHOOLS, https://paulmitchell.edu/our-story (last visited Feb. 11, 2026).

58. JPMS was launched with just three products, all under the product line Paul Mitchell®: Shampoo One®, Shampoo Two®, and The Conditioner®.

59. Mitchell acted as the face of JPMS, being featured in the advertising for the company.

60. JPMS quickly expanded to include other products under the Paul Mitchell® brand.

61. In 1989, Mitchell passed away and left his share of JPMS to his son, Angus Mitchell.

62. After Paul Mitchell's death, JPMS changed its marketing to make DeJoria the face of JPMS. DeJoria is featured in JPMS's advertising campaigns and on the JPMS website. DeJoria is currently listed as co-founder and chairman of the board at JPMS.[2]

63. Around the same time, JPMS also recruited Luke Jacobellis to become an officer and director of JPMS. Jacobellis served, and continues to serve, in various positions in the JPMS organization.

64. In 2001, JPMS established Paul Mitchell Schools as a joint venture with Von Curtis Academy.

65. These schools are operated under the brand-name of "Paul Mitchell Schools" and have over 100 locations across the United States.

66. Upon information and belief, California has more Paul Mitchell Schools than any other state.

---

[2] Our Leaders, PAUL MITCHELL, https://www.paulmitchell.com/pages/our-leaders (last visited Feb. 11, 2026).

67. Students that attend these schools exclusively use JPMS hair-care products and are specifically educated about the JPMS brand, including its "cruelty free" promises.

68. "Cruelty free" is a term used in the cosmetics industry that means products and the ingredients in those products are not tested on animals anywhere in the development, testing, manufacturing, or production of a product.

69. In 2021, Michaeline DeJoria, John Paul DeJoria's daughter, took over as the CEO of JPMS.

70. Today, JPMS manufactures hair-care products through several brands, including Paul Mitchell®, Clean Beauty, Tea Tree, MITCH®, Awapuhi Wild Ginger®, Neuro®, and MVRCK™.

71. It is estimated that JPMS has annual revenues of over $1 billion per year.

72. Upon information and belief—given JPMS's presence in California and the number of individuals residing in California—JPMS sells more hair-care products in California than any other state.

**B. JPMS's "Cruelty Free" Promise**

73. Since its formation, a key component of JPMS's brand was that JPMS's products were cruelty free.

74. Throughout its history, JPMS committed to never perform animal testing and included that commitment in its advertising, on its website, and on its products.

75. JPMS has claimed and continues to claim it is a "A PIONEER IN CRUELTY-FREE HAIR-CARE SINCE 1980"[3] or "*SINCE OUR FOUNDING IN 1980, WE HAVE BEEN COMMITTED TO CRUELTY-FREE HAIR CARE.*"[4]

76. JPMS also promises: "No Animal Testing. Never Have. Never Will."




77. People for the Ethical Treatment of Animal's ("PETA") has a certification program called "Beauty Without Bunnies," which requires companies to sign a statement of assurance verifying it does not test on animal anywhere in the world.

---

[3] Our Company Story, Your Why, PAUL MITCHELL YOUTUBE CHANNEL (Nov. 25, 2024), https://www.youtube.com/watch?v=_CBfDxvtL-c (last visited Feb 11, 2026); Our Product, PAUL MITCHELL, https://www.paulmitchell.com/company/our-product (last visited Feb. 13, 2023).

[4] Cruelty-Free, PAUL MITCHELL, https://www.paulmitchell.com/pages/cruelty-free (last visited Feb. 11, 2026).

78. In 1989, JPMS signed PETA's Beauty Without Bunnies statement of assurance "pledging never to test its products on animals," and as of at least January 2023, JPMS appeared on PETA's list of companies that does not test on animals anywhere in the world, including China.[5]

79. JPMS has repeated its promise to never test on animals in its long-standing advertising, on social media, and on its website.

80. In 2006, JPMS placed an ad in Vogue, representing: "Paul Mitchell cruelty free environmentally friendly."




[5] Featured Cruelty-Free Company: John Paul Mitchell Systems, PETA (Jan. 30, 2018), https://www.peta.org/living/personal-care-fashion/paul-mitchell/ (last visited Feb. 11, 2026); Paul Mitchell Systems, PETA, https://web.archive.org/web/20230126220018/https://crueltyfree.peta.org/company/paul-mitchell-systems/ (last visited Feb. 11, 2026).

81. In 2006, JPMS placed an ad in Vogue, representing: "cruelty free environmentally friendly Paul Mitchell."




82. In 2007, JPMS placed an ad in Vanity Fair, representing: "Join together to preserve our natural resources, protect our animals and ensure the rights of all people."

83. In 2008, JPMS placed the same ad in Vanity Fair and Vogue featuring DeJoria and his then ten-year old son, representing: "Be brave. Join me, my father and all our John Paul Mitchell Systems family to help protect our world, our people, and every living creature."

84. In July 2010, JPMS placed a “Special Advertising Section” in Harper’s Bazaar, representing: “The company is devoted to earth-friendly practices, being the first hair care business to publicly oppose animal testing.”

85. In 2012, JPMS represented on its website: “Paul Mitchell is always looking out for our furry friends. In 1987, we became the first professional beauty company to announce that we don’t conduct or endorse animal testing.”[6]




**Protecting Our Animals**
Paul Mitchell is always looking out for our furry friends. In 1987, we became the first professional beauty company to announce that we don't conduct or endorse animal testing.

86. For its 35th anniversary in 2015, JPMS reiterated its promises about animal testing: “For the 35 years we’ve been in business, we’ve never tested our products on animals (and never will!). In fact, we were the first professional beauty company to stand up against animal testing . . . .”[7]

87. Upon information and belief, JPMS’s claims about animal testing were developed and issued from its headquarters in California.

88. In 2017, JPMS issued a blog statement about its new logo: “That’s why we were the first professional beauty company to publicly stand up against animal testing—and 37 years later, we’re still rockin’ that pledge to our furry friends. Testing on animals is cruel and unnecessary, yet a lot of beauty brands still engage in

---

[6] Our Story, PAUL MITCHELL, https://web.archive.org/web/20120123203937/http://www.paulmitchell.com/EN-US/OURSTORY/CARINGFOROURPLANET/Pages/Home.aspx (last visited Feb. 11, 2026).

[7] *Cheers to 35 Years!*, PAUL MITCHELL, https://web.archive.org/web/20151223112327/https://www.paulmitchell.com/our-story/our-blog/2015/april/cheers-to-35-years/ (last visited Feb. 10, 2023).

this ugly practice. Not us! We never have, and we never will. Testing on actual humans makes way more sense, and that's why we're proud to have our very own Production Innovation Center to perfect our products for you . . . . We're so passionate about this cause that going forward in 2017, we're featuring a new 'No Animal Testing' logo on all of our products to emphasize and highlight our dedication."[8]

89. In 2020, in honor of JPMS's 40th anniversary, JPMS unveiled a new logo on its products to highlight its "founding principle to never test on animals."[9]

2020

In honor of our 40th Anniversary, the Pioneer In Cruelty-Free Dove Logo is added to packaging to highlight our founding principle to never test on animals.

90. Upon information and belief, the decisions to adopt new logos reiterating JPMS's cruelty-free stance, as well as the design, implementation, and placement on the products, were made from its headquarters in California.

---

[8] Blog Post, *No Animal Testing*, PAUL MITCHELL (Feb. 2, 2017), https://web.archive.org/web/20230320160854/https://www.paulmitchell.com/blog/no-animal-testing/ (last visited Feb. 11, 2026).

[9] Our Product, PAUL MITCHELL, https://www.paulmitchell.com/company/our-product (last visited Feb. 10, 2023).

91. Today, JPMS continues to promote its cruelty-free stance.

92. JPMS's website features "Our Story," which through at least 2023 shows a photo of Mitchell and DeJoria next to its claim: "We were the first professional hair care company to take a stand against animal testing . . . ."[10]






93. Our Story on the JPMS website currently links to a YouTube video, where JPMS represents: "A PIONEER IN CRUELTY-FREE HAIR CARE."[11]

---

[10] Our Story, PAUL MITCHELL, https://www.paulmitchell.com/company (last visited Feb. 10, 2023).

[11] Our Story, PAUL MITCHELL, https://www.paulmitchell.com/pages/our-story (last visited Jan. 23, 2026); Our Company Story, Your Why, PAUL MITCHELL YOUTUBE CHANNEL (Nov. 25, 2024), https://www.youtube.com/watch?v=_CBfDxvtL-c (last visited Jan. 23, 2026).

94. The website has continually featured photos of Michaeline DeJoria promoting JPMS as a "Pioneer in Cruelty-Free."[12]



PIONEER IN CRUELTY-FREE

Here at John Paul Mitchell Systems®, we're passionate about beauty from the inside out. And that commitment has been at the core of all that we do since we began in 1980. That's why we were the first professional beauty company to publicly stand up against animal testing—and over 40 years later, we're still rockin' that pledge to our furry friends.

All our products are researched, formulated and tested on humans, and that's why we're proud to have our very own Production Innovation Center to perfect our products for you.

We didn't stop there. We've committed to transitioning 10 of our 12 product lines to 100% vegan by 2023, and all of our brushes are made with synthetic bristles rather than animal hair. In addition to being cruelty-free, nylon brushes are more hygienic since they're easier to clean and repel bacteria more effectively than animal hair. That's a win for you and a win for the animals!







---

[12] Product, PAUL MITCHELL, https://web.archive.org/web/20230308185707/https://www.paulmitchell.com/company/our-product# (last visited Feb. 11, 2026); Our Story, PAUL MITCHELL https://www.paulmitchell.com/pages/our-story (last visited Feb. 11, 2026).

95. JPMS's website currently states: "*COMMITTED TO CRUELTY-FREE PRODUCTS AND SOURCING*" and "*SINCE OUR FOUNDING IN 1980, WE HAVE BEEN COMMITTED TO CRUELTY-FREE HAIR CARE.*"[13]

96. JPMS has official Facebook pages, where it has continuously touted its no-animal testing promise, representing: "CRUELTY-FREE SINCE 1980" or "Cruelty-Free products."[14]







97. JPMS's official Instagram account has made similar representations, including "CRUELTY-FREE SINCE 1980" and "Cruelty-Free Products:[15]

---

[13] Cruelty-Free, PAUL MITCHELL, https://www.paulmitchell.com/pages/cruelty-free (last visited Jan. 23, 2026).

[14] Paul Mitchell (@PaulMitchellHairCareUS), FACEBOOK, https://www.facebook.com/PaulMitchellHairCareUS (last visited Feb. 10, 2023); Paul Mitchell (@PaulMitchellUS.HairCareGlobal), FACEBOOK https://www.facebook.com/PaulMitchellUS.HairCareGlobal/ (last visited Jan. 23, 2026).

[15] Paul Mitchell (@paulmitchell), INSTAGRAM https://www.instagram.com/paulmitchell/ (last visited Feb. 10, 2023); https://www.instagram.com/paulmitchell/?hl=en (last visited Jan. 23, 2026).







98. In a 2022 Instagram post, JPMS reiterated that it was a "PIONEER IN CRUELTY-FREE HAIR CARE." with the caption: "Find these symbols on our packaging to see a few ways we are looking out for our home. #World Environment Day."[16]




---

[16] Paul Mitchell (@paulmitchell), INSTAGRAM (June 5, 2022), https://www.instagram.com/p/Cebz5c5s5b5/ (last visited Feb. 10, 2023).

99. In promoting its clean beauty brand in 2022, JPMS made the following post and caption, claiming the products are "cruelty-free":[17]




100. In promoting its Tea Tree brand in 2022, JPMS made the following post and caption, again promising its products are cruelty free:[18]




---

[17] Paul Mitchell (@paulmitchell), INSTAGRAM (April 16, 2022) https://www.instagram.com/p/CcbA0Y-p3Tm/ (last visited Feb. 10, 2023).

[18] Paul Mitchell (@paulmitchell), INSTAGRAM (February 11, 2022) https://www.instagram.com/p/CZ22Zd2pjQW/ (last visited Feb. 10, 2023).

101. In 2024, JPMS reiterated on Instagram its commitment to being cruelty free.[19]




102. In 2025, for Earth Day, JPMS reiterated that it was a "Pioneer in Cruelty-Free Hair Care" on Facebook and Instagram:[20]




[19] Paul Mitchell (@paulmitchell), INSTAGRAM (Oct. 4, 2024), https://www.instagram.com/p/DAtRLNbgqx7/?hl=en&img_index=1 (last visited Jan. 23, 2026).

[20] Paul Mitchell (@PaulMitchellUS.HairCareGlobal) FACEBOOK (Apr. 22, 2025), https://www.facebook.com/photo?fbid=1097750822386566&set=pcb.109775093571




103. In promoting its clean beauty brand, JPMS claims its products are "A PIONEER IN CRUELTY-FREE HAIR CARE."[21]

104. Upon information and belief, the representations and content of JPMS's website and social media pages were developed and issued from its headquarters in California.

105. JPMS includes its representations and promises about being cruelty-free on the products, and/or product labels.

---

9888 (last visited Jan. 23, 2026); Paul Mitchell (@paulmitchell), INSTAGRAM (Apr. 22, 2025), https://www.instagram.com/p/DIwhlvIOrco/?hl=en&img_index=3 (last visited Jan. 23, 2026).

[21] Clean Beauty, PAUL MITCHELL, https://web.archive.org/web/20230320150437/https://www.paulmitchell.com/paul-mitchell/clean-beauty/whats-new (last visited Feb. 11, 2026); Clean Beauty, PAUL MITCHELL, https://www.paulmitchell.com/pages/clean-beauty (last visited Jan. 23, 2026).

106. These images are just a few examples of JPMS's labels, promising it never performs animal testing or that its products are cruelty free:














107. JPMS recently updated its packaging, but continues to represent that it is "A Pioneer in Cruelty-Free Hair Care," as shown below:








108. Upon information and belief, the decision to put JPMS's cruelty-free claims on all its products and product labels was made from its headquarters in California.

## C. Animal Testing in the Cosmetic Industry

109. Animal testing has been used in the cosmetics industry in the past to ensure that products were safe for consumers to use.

110. Testing performed on animals in the cosmetics industry include various toxicity and irritancy tests.

111. Acute toxicity tests are used to determine the danger of exposure to a chemical by mouth, skin, or inhalation and is usually performed on mice or rats.[22]

---

[22] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Feb. 11, 2026); Earnest Oghenesuvwe Erhirhie, Chibueze Peter Ihekwereme, & Emmanuel Emeka Ilodigwe, *Advances in acute toxicity testing: strengths, weaknesses and*

112. LD50, also known as Lethal Dose 50, is a type of acute toxicity test where animals are dosed with a test chemical to determine the dose at which at least half of the test animals die.[23]

113. Fixed dose method is another type of acute toxicity test, but it does not use death at the endpoint. The testing will be stopped when the animal demonstrates signs of ailment or distress.[24]

114. Other acute toxicity tests include the up-and-down procedure and acute toxic class methods. While these tests do not result in the death of the animal, the animals will often endure intense pain, convulsions, loss of motor function, and seizures.[25]

115. The animals are killed when all the testing is complete so a necropsy can be performed to determine internal damage.[26]

116. The Draize test is a test devised in 1944 by John H. Draize and Jacob M. Spines, toxicologists at the FDA, to assess how chemicals cause eye and skin irritation. The Draize test is generally performed on rabbits, particularly albino rabbits, although the testing can be performed on other animals as well.[27]

---

*regulatory acceptance*, Interdisciplinary Toxicology, https://www.ncbi.nlm.nih.gov/pmc/articles/PMC6117820/ (last visited Feb. 11, 2026).

[23] *Id.*

[24] *Id.*

[25] *Id.*

[26] *Id.*

[27] Draize test, WIKIPEDIA, https://en.wikipedia.org/wiki/Draize_test (last visited Feb. 12, 2026).

117. During the testing a chemical is placed in the eye or on the skin of a conscious and restrained animal, left on for a set amount of time, rinsed off, and its effects are then recorded.[28]

118. The animals are then observed for up to fourteen days looking for signs of erythema and edema in the skin or redness, swelling, discharge, ulceration, hemorrhaging, cloudiness, or blindness in the tested eye.[29]

119. The animals are killed after the testing if the test causes irreversible damage to the eye or skin. If the test does not cause permanent damage, the animals are typically used again once all traces of the tested product have dispersed from the testing site.[30]

120. Skin sensitization tests are used to determine if a chemical causes an allergic reaction.

121. One type of skin sensitization test is the Guinea Pig Maximization Test, where a chemical is injected into the guinea pig, along with a chemical adjuvant to boost the immune reaction. Multiple doses are given until the animal develops an allergic reaction.[31]

---

[28] *Id.*

[29] *Id.*

[30] *Id.*

[31] Animals in Science, AMERICAN ANTI-VIVISECTION SOCIETY, https://aavs.org/animals-science/how-animals-are-used/testing/ (last visited Feb. 12, 2026).

122. Another skin sensitization test is the Buehler test, which is similar to the Guinea Pig Maximization Test, but no adjuvant is used to boost the immune reaction.[32]

123. In both the Buehler test and the Guinea Pig Maximization test the animals are killed after testing.[33]

124. A more recent and commonly used skin sensitization test is the Local Lymph Node Assay (LLNA), where test chemicals are applied to the surface of the ears of mice. The mice are then killed and then their lymph node cells are removed and analyzed.[34]

125. These tests are not performed on the individual products sold to consumers, but in the development or approval of such products, meaning animal testing would be done on a sample of a particular product or on its components.

**D. Consumers' Attitudes Toward Animal Testing**

126. Consumers around the world have called for the end of animal testing for cosmetics. A vast number of consumers are opposed to it.[35]

127. U.S. consumers prefer cosmetic products that have not been tested on animals.

---

[32] *Id.*

[33] *Id.*

[34] *Id.*; Local lymph node assay, WIKIPEDIA, https://en.wikipedia.org/wiki/Local_lymph_node_assay (last visited Feb. 12, 2026).

[35] Kerry Postelwhite, *'Brands can no longer ignore the 8.3 million people who want end to animal testing'*, REUTERS EVENTS (Oct. 14, 2018), https://web.archive.org/web/20230320181012/https://www.reutersevents.com/sustainability/brands-can-no-longer-ignore-83-million-people-who-want-end-animal-testing (last visited Feb. 12, 2026).

128. In a recent poll from 2019, 79% of Americans support a federal law that would end animal testing on cosmetics.[36]

**E. Regulations on Animal Testing for Cosmetics in the U.S. and Globally**

129. The FDA has the authority to regulate cosmetics under the Federal Food, Drug, and Cosmetic Act ("FD&C Act"), related statutes, and regulations promulgated under the FD&C Act.[37]

130. "The FD&C Act does not specifically require the use of animals in testing cosmetics for safety, nor does the Act subject cosmetics to FDA premarket approval."[38]

131. The FDA goes beyond not requiring animal testing to inform that animal testing is not required and to suggest that "consideration should be given to the use of scientifically valid alternative methods to whole-animal testing."[39]

132. Because the practice of animal testing is found to be objectionable and cruel by so many, several states and other countries have gone further and banned the practice.

---

[36] New Poll Reveals US United Against Cosmetics Animal Tests, CRUELTY FREE INTERNATIONAL, https://web.archive.org/web/20251115060658/https://www.crueltyfreeinternational.org/latest-news-and-updates/new-poll-reveals-us-united-against-cosmetics-animal-tests (last visited Jan. 23, 2026).

[37] Animal Testing & Cosmetics, U.S. FOOD & DRUG ADMINISTRATION https://www.fda.gov/cosmetics/product-testing-cosmetics/animal-testing-cosmetics (last visited Jan. 23, 2026).

[38] *Id.*

[39] *Id.*

133. In 1988, the United Kingdom was the first country to ban animal testing on cosmetics.

134. The European Union also banned animal testing on cosmetics in a phased approach that was completed in 2013.

135. Other countries including Israel, India, Turkey, Brazil, New Zealand, and Norway also have bans on animal testing.

136. Twelve states have passed laws that ban or limit the sale of cosmetic products tested on animals, including, California (Cal. Civ. Code § 1834.9.2), Hawaii (Haw. Rev. Stat. § 321-30.4), Illinois (410 Ill. Comp. Stat. 620/17.2), Louisiana (La. Stat. § 51:772), Maine (Me. Rev. Stat. tit. 10, § 1500-M), Maryland (Md. Code , Health-Gen. § 21-259.2), Nevada (Nev. Rev. Stat. § 598.993), New Jersey (N.J. Rev. Stat. § 4:22-59), New York (N.Y. Gen. Bus. Law § 399-AAAAA), Oregon (Or. Rev. Stat. § 646A.009), Virginia (Va. Code § 59.1-572), and Washington (Wash. Rev. Code § 69.05.020).

137. The legislative history of some of these laws reveals public support for banning animal testing.

138. Nev. Rev. Stat. § 598.993 prohibits the sale of cosmetics that have been tested on animals after January 1, 2020.

139. The legislative history of Nev. Rev. Stat. § 598.993 shows that the motivations for the bill were, in part, to meet the demand of and protect consumers: "Consumers ***overwhelmingly*** are starting to reject products tested on animals. Statistically, businesses that have eliminated their animal testing policies have been successful and profitable. On an anecdotal level, I can tell you that I have had dozens of people come to me since I introduced this bill and say, I only use products that are

not tested on animals; I always check the label; and it is so hard to know if a product has been tested on animals." Nevada Assembly Committee Minutes, 5/15/2019 (emphasis added).

140. Wash. Rev. Code Ann. § 69.05.020 makes it "unlawful for a manufacturer to sell or offer for sale in this state a cosmetic if the cosmetic was developed or manufactured using cosmetic animal testing that was conducted or contracted for by the manufacturer or any supplier of the manufacturer," starting January 1, 2025.

141. The accompanying Senate Bill Report ESHB 1097, dated February 29, 2024, summarizes the public testimony, noting it was in favor of the bill: "This bill has received bipartisan support and represents progress in the cosmetics industry. There are more options for testing that are effective and do not require animal testing. Legislation like this is being implemented worldwide. Oregon is the newest state among the 12 states that have enacted laws similar to this. . . . Let's make Washington a more caring and compassionate place. Not only is animal testing unnecessary, it is not a sure way to ensure safety for humans. There is a global demand for products not tested on animals."

142. Cal. Civ. Code § 1834.9.5, prohibits manufacturers from selling cosmetics in California if the cosmetic was developed or manufactured using an animal test, on or after January 1, 2020.

143. The legislative history of Cal. Civ. Code § 1834.9 (S.B. 1249) shows that over 4,000 individuals contacted the legislature to voice support of the bill. California Bill Analysis, S.B. 1249 Sen., 8/31/2018. In contrast only four entities (and no individuals) voiced opposition to the bill. *Id.*

144. The bill analysis also provided: "The bill has received an ***intense groundswell of support from concerned citizens, animal welfare groups, and many companies in the cosmetic industry*** that are strongly committed to a vision of a truly 'cruelty-free standard' for cosmetic products sold in California. The bill is also supported by a coalition of approximately 80 cosmetic companies who attest that they are proof that a company can be profitable but also committed to manufacturing products without any reliance on animal testing whatsoever." California Bill Analysis, S.B. 1249 Assem., 6/26/2018 (emphasis added).

145. That analysis further noted: "The Committee has received over 6,500 letters in support of the bill from individuals providing a California address, and has taken note of an online petition signed by more than 150,000 persons from around the world, voicing support for this bill." California Bill Analysis, S.B. 1249 Assem., 6/26/2018.

146. While that law was being debated in the California legislature, JPMS also showed support for the law but took it a step further and lobbied the California legislature to adopt a more restrictive law that would not have provided certain exemptions, including not exempting manufacturers from selling in California if they sold in any foreign markets where animal testing was required, such as China.

147. DeJoria sent a letter on behalf of JPMS to the California Senate Judiciary Committee opposing the exemption: "Our company is committed to manufacturing products without harming any animals and we do not purchase ingredients from suppliers that test their products on animals. We have also been able to gain approval for a small, select group of products for sale in China without the use of animal testing." California Bill Analysis, S.B. 1249 Assem., 8/10/2018.

148. Despite JPMS's representations that they could sell in China without testing on animals, the exemption for companies who sold in foreign markets that required animal testing was included in the final bill.

**F. Beauty Industry in China**

149. The Chinese cosmetics market is the second largest in the world after the United States, which includes skincare, haircare, and other toiletries.[40]

150. According to a 2022 survey, China has an increasing demand for "luxury or premium cosmetic products."[41]

151. As of 2022, more than half of Chinese cosmetics consumers prefer foreign brands over local ones.[42]

152. The market size of cosmetics in China was more than 455 billion yuan in 2021, equivalent to over $65 billion in current dollars.[43]

---

[40] China Cosmetic Regulations – Comprehensive Guide, BIORIUS, https://biorius.com/cosmetic-regulations/china-cosmetic-regulations/#:~:text=The%20Cosmetics%20Market%20in%20China,23%20billion%20euros)%20in%202018. (last visited Jan. 23, 2026); Cosmetics market in China – statistics & facts, STATISTA, https://www.statista.com/topics/1897/cosmetics-in-china/#topicOverview (last visited Jan. 23, 2026).

[41] Cosmetics market in China statistics & facts, STATISTA, https://web.archive.org/web/20230323183803/https://www.statista.com/topics/1897/cosmetics-in-china/#topicOverview (last visited Jan. 23, 2026).

[42] Cosmetics market in China – statistics & facts, STATISTA, https://web.archive.org/web/20220709033230/http://www.statista.com/topics/1897/cosmetics-in-china/ (last visited Jan. 23, 2026).

[43] Cosmetics market size in China from 2013 to 2021 with forecasts until 2023, STATISTA, https://web.archive.org/web/20220706154008/https://www.statista.com/statistics/875794/china-cosmetics-market-size/ (last visited Jan 23, 2026); Chinese Yuan to United States Dollar, GOOGLE FINANCE,

153. For 2023, the retail trade revenue of hair-care products in China amounts to $8.46 billion, making the Chinese hair-care market extremely lucrative for U.S. companies.[44]

154. According to the United States Department of Commerce, "[n]iche and premium hair products are the fastest growing segment for U.S. exports to China."[45]

155. Until 2021 it was mandatory for cosmetic brands who wanted to sell imported cosmetic products in China to obtain a specific approval issued by the National Medical Products Administration ("NMPA") (formerly the China Food and Drug Administration ("CFDA")).

156. Hair-care products, such as shampoo, conditioner, and styling products, are classified under Chinese law as ordinary or "non-special use cosmetics."

157. Hair dye, skin whitening and sunscreen are classified under Chinese law as "special use cosmetics."

158. As outlined below, JPMS has registered both non-special use and special use cosmetics in China.

---

https://www.google.com/finance/quote/CNY-USD?sa=X&ved=2ahUKEwj8w72Vwov8AhUzMUQIHeJlBlgQmY0JegQIBhAc (last visited Jan. 23, 2026).

[44] Hair Care - China, STATISTA, https://web.archive.org/web/20230322221721/https://www.statista.com/outlook/cmo/beauty-personal-care/personal-care/hair-care/china (last visited Jan. 23, 2026).

[45] Asia Personal Care & Cosmetics Market Guide, 2016, United States Department of Commerce, International Trade Administration.

159. Since the early 1990s, China's imported cosmetics regulatory regime has been structured around mandatory hygiene licensing and safety evaluation requirements, which required animal testing.

160. The Regulations on the Hygiene Supervision over Cosmetics (化妆品卫生监督条例) issued by the former Ministry of Health (now cancelled as part of a PRC institutional reform) on November 13, 1989, and effective from January 1, 1990 ("1990 Regulation") required import applicants to submit health and safety evaluation materials as part of the approval process. These requirements incorporated animal toxicology testing conducted by government-authorized institutions, meaning imported cosmetics could not lawfully enter the Chinese market absent completion of the required safety testing framework.

161. Accordingly, starting in 1990, all imported special use and non-special use cosmetics had to be tested on animals in Chinese designated and certified laboratories before they could be approved for importation and distribution in the Chinese market.

162. Starting in 1990, all foreign-produced cosmetics needed to be registered with and approved by the NMPA before they could be imported and sold in China.

163. Over time, there has been limited loosening of animal testing requirements in China, specifically the possibility of an exemption starting in 2014 for non-special use cosmetics manufactured in China and the possibility for an exemption starting in 2021 for overseas manufactured non-special use cosmetics.

164. As of today, animal testing on special use cosmetics is still required in China, with no possible exemptions set forth in Chinese law.

165. Starting in 1990, Chinese law required foreign cosmetics manufacturers seeking registration of imported products in China to appoint a domestic responsible agent to act on their behalf before the NMPA (and its predecessor organizations). Such agents could only lawfully submit applications with express manufacturer authorization and support. Such support, includes access to product formulas, packaging, and being issued formal powers of attorney.

166. By 2010, Chinese regulators also formalized in the Regulations on Accepting Applications for Administrative Approvals for Cosmetics (化妆品行政许可申报受理规定) issued by the former China Food and Drug Administration (cancelled as part of a PRC institutional reform) and effective from April 1, 2010, the administrative acceptance framework for imported cosmetics, requiring that examination and toxicology reports be issued by testing institutions recognized by the NMPA (at that time the CFDA). Thus, imported cosmetics companies such as JPMS could only obtain product registrations only through submission of certified toxicology testing documentation from designated government-authorized laboratories. The domestic responsible agent was required to file such examination and testing reports when making an application to the NMPA for product registration for a foreign manufacturer such as JPMS.

167. All NMPA-designated testing institutions are in China.

168. This means the domestic responsible agent must hire a laboratory in China to perform the required testing. These laboratories are designated and certified by the Chinese government.

169. The examination and testing report is governed by Chinese-specific regulations, with standards issued/updated in 1999, 2002, 2007, and 2015.

170. From 1999 to 2001, China's Hygienic Standards for Cosmetics ("1999 Standards") dictated the required examination and testing reports needed to import cosmetics in China.

171. Among those tests are the skin and eye irritation tests.

172. The instructions for the skin irritation test provide: "Although many kinds of mammals can be selected as experimental animals, the white rabbit should be the first choice."

173. Those instructions further provide: "At least four rabbits should be used, but the number of experimental animals should be increased if certain suspicious reactions need to be clarified."

174. The 1999 Standards then describe the testing steps which include the following:

a. Removing two patches of skin on the back of the animal 24 hours before testing;

b. applying the product over one of the skin patches and then covering with gauze and cellophane and taping it to the animal for at least four hours; and

c. observing the skin reactions on the application site at 1, 24, and 48 hours after removing the product.

175. The instructions for the "Acute Eye Irritation/Corrosion Test" provide that white rabbits are preferred and dictates using four rabbits.

176. The "test procedures" include the following:

a. Pulling the lower eyelid of one eye of the rabbit away from the eyeball, and putting the test product in the conjunctival sac;

b. keeping the eyelid closed for 5-10 seconds to prevent the loss of the test product; and

c. leaving the product in the eye and not rinsing it for 24 hours.

177. From 2002 to 2006, China's Hygienic Standards for Cosmetics ("2002 Standards") dictated the required examination and testing reports needed to import cosmetics into China.

178. That testing included the skin irritation test and the eye irritation test.

179. The 2002 Standards again recommend using white rabbits to perform the skin irritation test, require shaving the hair off of the test rabbits, and applying the test substance to the skin, covering it with gauze and cellophane, and leaving it on the skin for up to four hours.

180. The 2002 Standards also recommend using white rabbits for the eye irritation test, applying the test substance to the eye, keeping the eye closed for 1 second after applying the test substance, and not rinsing the eye for 24 hours.

181. In 2006, Chinese regulators further formalized the import approval dossier requirements by expressly mandating in the Regulations on Accepting Applications for Hygiene Administrative Approvals for Cosmetics(化妆品卫生行政许可申报受理规定) issued by the former Ministry of Health and effective from June 1, 2006 ("2006 Regulations"), that imported cosmetics applications needed to include certified toxicology testing reports. These rules confirm that toxicological evaluation was not discretionary, but an explicit prerequisite for obtaining hygiene approval and Chinese market access for imported cosmetics products.

182. From 2007 to 2014, China's Hygienic Standards for Cosmetics ("2007 Standards") dictated the required examination and testing report to import cosmetics into China.

183. These 2007 Standards provide that the examination and testing report include multiple skin irritation tests for cosmetics used daily, acute skin irritation tests for cosmetics rinsed after use, and acute eye irritation tests for products that may come into contact with eyes.

184. The specifications for those tests are described in detail in the Hygienic Standards for Cosmetics.

185. The acute skin irritation test includes applying the test substance "once (or more)" to the shaved skin of the animal, leaving the product on for 2 hours or longer, with no set maximum amount of time, and then observing skin reactions at 1, 24, 48, and 72 hours after the product is removed.

186. The multiple skin irritation test includes the same procedure as the acute skin irritation test, but the product is applied to the animal every day for 14 days, shaving the animal's skin before each application.

187. The 2007 Standards note regarding the skin irritation tests: "Animals should be humanely executed if they show signs of severe depression and distress at any stage of the test."

188. The acute eye irritation test involves applying the test substance in the conjunctival sac of one eye of the animal and not rinsed for at least 24 hours, but the substance is only rinsed if deemed necessary. The eyes are examined at 1, 24, 48, and 72 hours after the substance is applied. If no irritation is found, the test is

terminated. If irritation is found, the test continues and the eyes of the animals are examined again at 4 and 7 days.

189. The 2007 Standards note regarding the acute eye irrigation test: "Animals that show signs of severe depression and distress at any stage of the test should be humanely put to death and the subject evaluated appropriately in the light of the test. Animals that show corneal perforation, corneal ulceration, corneal 4 points for more than 48h, lack of light reflex for more than 72h, conjunctival ulceration, gangrene and decay, which are usually signs of irreversible damage, should also be humanely executed."

190. Since 2015, the examination and testing report was governed by the Safety and Technical Standards for Cosmetics ("2015 Standards").

191. Those 2015 Standards provide that the examination and testing report must include the dermal/skin irritation test and the acute eye irritation test.

192. The specifications for those tests are similar to the 2007 tests and are described in detail in the 2015 Standards, but they include placing the product to be tested in the eye of the animal or on the shaved skin of the animal, leaving that product in the eye or on the skin, and observing its effects at 1, 24, 48, and 72 hours after application.

193. Those regulations also provide: "If animals show severe depression and pain at any stage of the trial, they should be executed humanely."

194. The process to import products into China is also described by the United States Department of Commerce in its "Asia Personal Care & Cosmetics Market Guide, 2016," which states:

> Cosmetics in China are categorized as ordinary and special use cosmetics. Perfume, skin care, shampoo and color cosmetics fall into ordinary products and special use products refer to hair dye, hair perm, hair-growing, sunblock, anti-spot, slimming, breast-beautifying, depilatories and deodorant etc.
>
> According to the CFDA (China Food and Drug Administration), all foreign cosmetic product manufacturers must complete a safety and health quality test, and obtain a hygiene permit before they are allowed to sell in the Chinese market. Application for this pre-market approval process can only be carried out by a Chinese legal entity. Overseas cosmetics manufacturers without legal representation in China are thus required to apply for the permit through agent services. The Manufacture [sic] needs to sign a "Letter of Authorization" confirming that it authorizes a Chinese company to be the registration responsible party in mainland China for the products.
>
> **Safety and Health Quality Test**
> This test is performed by designated laboratories appointed by the CFDA and are listed on the CFDA website. All these labs have different testing capabilities designated for testing against specific conditions, such as microbiology, hygienic chemistry, toxicology test (which includes animal testing) or conducting safe-for-human-use trials (for special use cosmetics). The test normally takes 2-3 months for ordinary cosmetics and 3-8 months for special-use cosmetics, while costs vary from $700 to $6,000 depending on the types and complexity of the products.

195. The Department of Commerce also describes the required testing and the application procedures:

> **Safety and Health Quality Test**
> This test is performed by designated laboratories appointed by the CFDA and are listed on the CFDA

website. All these labs have different testing capabilities designated for testing against specific conditions, such as microbiology, hygienic chemistry, toxicology test (which includes animal testing) or conducting safe-for–human-use trials (for special use cosmetics). The test normally takes 2-3 months for ordinary cosmetics and 3-8 months for special-use cosmetics, while costs vary from $700 to $6,000 depending on the types and complexity of the products.

. . .

**Hygiene Permit for Imported Cosmetics**

Once testing is completed, the designated laboratory will issue a test report which needs to be submitted together with the other required documents for the application of the Hygiene Permit from CFDA. A committee under CFDA convenes to technical review and evaluate of [sic] imported cosmetics. The technical review time will be 3 months generally. If one application has been approved, a certificate will be issued by the CFDA. Companies need to submit the following documents (all translated in Chinese and notarized by a Chinese notarization company):

Application form for the cosmetic product to be imported

- Chinese product name and nomenclature;
- Product formula;
- Product quality and safety control file (The product info such as appearance, flavor, batch no and shelf life is required. Other quality control index like heavy metals and microbiology should be provided as well);
- Original product packaging including labelling information and product information sheet;
- Testing report and relevant data from testing organization certified by CFDA;
- Safety assessment report of cosmetics containing potential risk substances;
- Stamped copies of power of attorney and business license of Chinese responsible agent;

- Statement from manufacturer guaranteeing that materials used meet the requirements of BSE free regions.
- Free Sale Certificate at production country (region) or country (region) of origin
- Brief description and diagram of production process
- Technical requirements for cosmetic products in text
- Other relevant information which can support the application

> The applicant will be notified by the CFDA within 5 days confirming whether the application is accepted or not. If the application is not accepted, the CFDA will provide explanation of discrepancies or missing documentation allowing the application to be resubmitted.
>
> The Hygiene Certificate is valid for 4 years, and foreign manufacturers are required to renew it at least 4 months before it is expired.

196. Foreign-produced cosmetics also must be imported through China in accordance with its customs regulations.

197. Through 2021, a company would have had to provide a copy of the NMPA registration when going through customs, along with other information required under Chinese law.[46]

---

[46] These requirements are found in the Measures for the Supervision and Administration of Inspection and Quarantine of Imported and Exported Cosmetics (formerly General Administration of Quality Supervision, Inspection and Quarantine of the People's Republic of China) (Order No. 143, revised according to Orders No. 238, No. 240, and No. 243 of the General Administration of Customs), the Announcement from General Administration of Customs (Announcement No. 99 of 2020), and Announcement on Adjusting the Supervision Requirements for Some Imported and Exported Goods (Announcement No. 99 of 2020).

198. An imported cosmetic must include a product label, which must list the manufacturer, the domestic responsible agent, and the NMPA registration number.

199. After November 7, 2018, non-special use cosmetics only required a premarket registration and could be imported after registration had been completed. That premarket registration requires the same animal testing as the earlier registrations—as detailed in the Safety and Technical Standards for Cosmetics (2015)—but changes the timing for when a product can be imported into China.

200. Up until 2018, a registration with the NMPA lasted four years, meaning that every foreign-produced cosmetic sold in China would have to be re-registered every four years and undergo animal testing every four years.

201. After 2018, registrations do not expire, but starting on January 1, 2022, the registrant must provide an annual report to the NMPA. If an annual report is not filed, the NMPA may cancel the registration.

202. In addition to the pre-market animal testing, all foreign-produced cosmetics can be subjected to post-market safety testing by Chinese authorities. This post-market testing may also include animal testing.

203. Although China announced regulatory reforms in the late 2010s, the NMPA inspection and technical work norms continued to specify required toxicological endpoints including, but not limited to, skin irritation, eye irritation, and sensitization testing, as part of the China cosmetics compliance regime. These Chinese government standards confirm that animal-based toxicology testing remained embedded in the imported cosmetics regulatory system until 2021.

204. On February 26, 2021, the NMPA promulgated the Administrative Provision for Cosmetics Registration and Filing Documents ("2021 Provision"),

which allowed for the first time foreign manufacturers of non-special use cosmetics to receive an exemption from animal testing. Starting on May 1, 2021, as a guarantee of safety, the NMPA can accept a specified certification and product safety assessment from the country of manufacture, instead of requiring animal testing.

205. China has no exemptions for special use cosmetics (whether internationally or domestically manufactured).

206. Since the 2021 Provision came into effect, several foreign manufacturers, including at least one based in California, have been granted approvals without requiring animal testing.

207. Since 2014, a cosmetic company can obtain an exemption from animal testing for non-special use cosmetics by setting up or using domestic manufacturing facilities in China. However, such an exemption does not apply to special use cosmetics.

208. Although domestic manufacturers of non-special use cosmetics can receive an exemption from animal testing, they can still be subject to post-market testing by Chinese authorities. This post-market testing may include animal testing.

**G. JPMS and the Chinese Market**

209. JPMS has been selling hair-care products in China since at least in 2001. JPMS has registered at least 137 imported cosmetic products in China during a regulatory period in which certified toxicology testing reports were expressly required for all imported cosmetic products. The scale of these registrations makes implausible any claim that JPMS could have accessed the Chinese market without complying with the mandatory toxicological testing regime applicable throughout this time.

210. Public registration records for JPMS products identify JPMS's appointed domestic responsible agents. From 2001 to 2012, JPMS named several entities to act as its responsible agent in China, including Shanghai Kenyou Trading Co., Ltd. ("Kenyou"), Kenxin Trading (Shanghai) Co. Ltd. ("Kenxin"), and Cantrust Trading (Shanghai) Ltd. ("Cantrust").

211. JPMS, through its domestic responsible agents, registered at least 74 products in China from 2001 to 2010, including special use cosmetics such as bleach, hair color, and perms. A list of those registrations is attached as Exhibit 1.

212. As each registration is good for four years, JPMS had products registered to be sold or used in China from 2001 through 2014.

213. JPMS's internal emails show that JPMS directly paid for many of those registrations.

214. In 2008, JPMS paid Cantrust for approximately 56 JPMS product registration in China, including paying for the testing and review fee for each product.

215. Each product received an NMPA registration number, meaning JPMS's domestic responsible agents submitted an application for each product that included the examination and testing report as outlined in the Safety and Technical Standards for Cosmetics. Each examination and testing report required JPMS's products (all 74 of them) to be tested on animals by the respective Chinese lab selected during the registration process.

216. In 2012, PETA exposed multiple cosmetic companies, both in the United States and Europe, that claimed to be cruelty free but had been selling products in China and undergoing animal testing.

217. PETA threatened to remove those companies from its Beauty Without Bunnies certification program if they did not stop selling in China.

218. As part of this effort, PETA contacted JPMS about its sales in China. JPMS evaded the issue and instead claimed it was just starting—"in early registration efforts in China"—despite selling in China for at least a decade, registering at least 62 products there, and directly paying for at least 56 product registrations in China.

219. That same year, JPMS announced that it would pull out of the Chinese market because it had been informed of the animal testing requirements to sell in China.[47]

220. DeJoria is quoted as saying: "Since Paul Mitchell was founded in 1980, we have been cruelty-free. We do not conduct or condone animal testing on our products, and we will not attempt to market our products in China until alternatives to animal testing methods have been accepted by the government. We are honored and encouraged to be working with China to bring about positive change. Paul Mitchell always has been and always will be cruelty-free!"[48]

221. In a January 18, 2013 press conference posted on Paul Mitchell UK's YouTube channel, DeJoria stated the following: "We found out in 2010—right before 2011—that they had changed the regulations in China, where products, all

[47] Paul Mitchell Receives PETA Plaudits for Pulling Out of Chinese Market, PETAUK (Jul. 27, 2012), https://www.peta.org.uk/media/news-releases/paul-mitchell-receives-peta-plaudits-for-pulling-out-of-chinese-market/ (last visited Feb. 12, 2026).

[48] *Id.*

products coming in, were to be tested on animals. Well, we immediately made an inquiry and saying: 'but we don't test on animals, we test on ourselves before we come out with products, can you make an exception?' And they said: 'Well, these new regulations we have, we think it's for the public's interest.' We immediately made a decision to stop selling [sic] China. Why would you choose such a thing? Our answer was simple. Because we believe what we say, and no amount of money is gonna change our minds. Did we lose a lot of money by doing that? We sure did. But it was okay because we stood by what we believed in."[49]

222. Upon information and belief, JPMS's decision to tell the public that it was in early registration attempts, had been recently informed of changes in Chinese law, and that it had left China because of the change in law, was made and disseminated from its headquarters in California.

223. JPMS's representation that Chinese law changed in 2010 to require animal testing is false. Animal testing had been mandatorily required to sell imported cosmetics in China since at least 1990 and continued to be the case until May 2021.

224. JPMS's extensive imported product registrations in China from 2001 to 2011 necessarily occurred within an animal-testing dependent regulatory framework.

225. Upon information and belief, instead of leaving China in 2012–2013, JPMS was exploring how to continue to sell in China.

---

[49] Paul Mitchell and Cruelty Free International London Press Conference at 1:16, PAUL MITCHELL UK YOUTUBE CHANNEL (Jan. 18, 2013), https://web.archive.org/web/20230320150231/https://www.youtube.com/watch?v=kzBOk_evx28 (last visited Feb. 12, 2026).

226. On February 29, 2012, JPMS China Holding Company was set up in Hong Kong, with JPMS owning 70% of its shares.

227. JPMS China Holding Company's directors included Luke Jacobellis, Fan Xu, and George Moon Lee. In 2014, JPMS China Holding Company was dissolved.

228. On February 28, 2014, JPMS China Investment LLC was incorporated in Nevada ("JPMS China Nevada").

229. JPMS China Nevada also registered as an out of state limited-liability company in California with its principal place of business at 20705 Centre Point Parkway, Santa Clarita, CA 91350, the same address as JPMS's principal place of business.

230. One of the past managers of JPMS China Nevada was Luke Jacobellis, a former president and CEO of JPMS.

231. The two managers of JPMS China Nevada are currently Fan Xu and Jason Yates (who was preceded by George Moon Lee). Yates is JPMS's current president.

232. JPMS China Nevada's corporate documents list Jacobellis, Xu, and Yates as all having addresses in California, with Jacobellis and Yates' address listed as 20705 Centre Point Parkway, Santa Clarita, CA 91350.

233. On July 9, 2014, JPMS China Nevada established JPMS Cosmetics (Beijing) Co., Ltd. ("JPMS Beijing") in China.

234. JPMS Beijing is a wholly owned subsidiary of JPMS China Nevada.

235. Jacobellis and Fan Xu were also directors of JPMS Beijing from its formation through at least 2021.

236. JPMS named JPMS Beijing as its domestic responsible agent in China.

237. From May 2015 to May 2021, JPMS Beijing, as JPMS's domestic responsible agent, registered 63 JPMS products for sale in China.

238. As it takes six months to register a product with the NMPA, JPMS Beijing would have had to apply for registrations in 2014.

239. A full list of those registrations is attached as Exhibit 2.

240. The NMPA maintains a database, listing each of the registrations.

241. Those products include Paul Mitchell®, Tea Tree, and MITCH® branded products.

242. Each product received an NMPA registration number, meaning JPMS's domestic responsible agents submitted an application for each product that included the examination and testing report as outlined in the Safety and Technical Standards for Cosmetics. Each examination and testing report required JPMS's products (all 63 of them) to be tested on animals by the respective Chinese lab selected during the registration process. Each product also lists JPMS as the manufacturer of the product. JPMS also had to provide a copy of the NMPA registration when going through customs, along with other information required under Chinese law. *See supra*.

243. Starting in 2014, JPMS contracted directly with the Beijing Institute for Drug Control ("BIDC") to perform the animal testing required to register its products in China.

244. The BIDC is a qualified inspection institute supervised by Beijing Municipal Medical Products Administration (Beijing MMPA). The BIDC is mainly

responsible for the inspection and testing of cosmetics, drugs, vaccines, health food and the formulation of relevant technical standards.

245. As an inspection institute supervised by Beijing MMPA, the BIDC has a high reputation for drug and cosmetics safety and faithfully fulfilling its obligation to public health.

246. According to the BIDC's website, the BIDC has a laboratory for toxicology tests.

247. In collaboration with JPMS's subsidiary, JPMS Beijing, the BIDC performed skin irritation tests and eye irritation tests to register the 63 products listed in Exhibit 2 with the NMPA.

248. As a matter of law, JPMS could not have imported foreign non-special use cosmetics into China, or gone through Chinese customs, without an NMPA registration, each of which required retaining a certified lab to do animal testing for that product.

249. The NMPA's approvals of JPMS's registrations reference JPMS's compliance with both the Hygienic Standards for Cosmetics (2007) and the Safety and Technical Standards for Cosmetics (2015).

250. JPMS products sold in China have the required product label and accompanying NMPA registration number. The following are images of some of those labels and registration numbers from JPMS products purchased in China:































251. Despite JPMS's statement that it had left China, it only paused operations in China in 2012 and 2013 and began seeking new NMPA registrations through JPMS Beijing in 2014.

252. To avoid animal testing, JPMS could have availed itself of the 2014 regulations that allowed companies to manufacture products in China, rather than import them.

253. Instead, JPMS continued to register and sell imported products in China from 2015 to 2021, an approach that required animal testing for each product.

254. Upon information and belief, JPMS's decisions to create JPMS Beijing and begin registering new JPMS products in China—requiring that animal testing be

performed by Chinese laboratories—were made and executed from its headquarters in California.

255. On September 7, 2017, JPMS announced that it was "NOW OFFICIALLY OPEN FOR BUSINESS IN CHINA!"[50]


Mara Gourdine / September 7, 2017 / News

GREAT NEWS: *NOW OFFICIALLY OPEN FOR BUSINESS IN* CHINA!

John Paul Mitchell Systems® is pleased to announce it has successfully gained acceptance to market select Paul Mitchell® and Tea Tree products in China—without animal testing.

After forming a dedicated team, creating relationships with experts and educators, and partnering with a U.S.-based testing facility, JPMS is able to service hairstylists and guests in China while maintaining its core corporate value of zero animal testing. Thanks to years of research and diligence, co-owner John Paul DeJoria's steadfast commitment to providing the finest-quality, cruelty-free professional products continues today.

256. JPMS claimed that it could sell select Paul Mitchell and Tea Tree products in China without animal testing, despite there being no exceptions in Chinese law to avoid animal testing for imported cosmetics and no record of an exemption from the NMPA.

257. There is no local authority (including municipal regulators) in China that could unilaterally waive national toxicology-testing requirements. China's

[50] Mara Gourdine, *Great News: Now Officially Open for Business in China!*, PEACE LOVE AND HAPPENINGS (Sep. 7, 2017), https://web.archive.org/web/20230320144342/https://www.peaceloveandhappenings.com/great-news-now-officially-open-for-business-in-china/ (last visited Feb. 12, 2026).

cosmetics approval framework operates under national-level rules administered through the NMPA and its predecessors, and local agencies do not possess unilateral authority to exempt imported cosmetics brands from mandatory safety requirements.

258. Even though Chinese regulations require the testing to occur in approved labs, which are all in China, JPMS claims that it performed some testing in front of China regulators in a U.S.-based testing facility and, as a result of that testing demonstration, was exempted from the animal testing requirements in China that apply to all imported non-special use cosmetics.

259. JPMS has continued to represent to this day that it is exempt, despite lab tests showing the BIDC performed animal testing on JPMS products to register its products in China.

260. In 2022, JPMS issued a response to how it was able to get approval in China without animal testing: "John Paul Mitchell Systems® brought a group of respected scientists from China to work side by side and train with their team and, as a result, the China FDA accepted the impressive results and reproducibility of the non-animal test alternatives and agreed to test a small selection of products for approval without the normal animal testing required. Subsequently, we were granted approval to market a select offering of Paul Mitchell® and Tea Tree products in China—without animal testing."[51]

261. In lobbying the California legislature in 2020 to remove an exemption from SB 1249—allowing manufacturers to sell in California even if they sold in any

[51] Is Paul Mitchell Cruelty-Free and Vegan?, ETHICAL ELEPHANT (Jan. 7, 2022), https://web.archive.org/web/20220627122902/https://ethicalelephant.com/paul-mitchell-cruelty-free-vegan/ (last visited Feb. 12, 2026).

foreign markets where animal testing was required—DeJoria represented that JPMS had an exemption from animal testing in China and the foreign market exemption should be removed from the bill.

262. Despite these representations, internal emails between JPMS senior employees recognized that the Chinese product registrations depended on animal testing and acknowledged that animal testing was being done to register products in China, with one senior executive noting: "This doesn't feel very good. Seems we are still relying on the animal testing to register these products."

263. Additionally, the NMPA—the only Chinese authority that can grant an exemption—has confirmed that before the change in law in 2021, no company was given an exemption from animal testing, and it has specifically confirmed that JPMS has not been granted any exemptions from animal testing.

264. Counsel for Plaintiffs reached out to the BIDC and it confirmed that it is only an inspection institute, that it has no right to give exemptions for the toxicological tests, and if a company has an exemption, that exemption would have to presented to the reviewing department (the NMPA).

265. After the BIDC confirmed that only the NMPA could grant an exemption, Plaintiffs' Counsel again reached out to the NMPA. The NMPA once again confirmed there were no exemptions from animal testing before the change in law in 2021 and that no exemption had been granted to JPMS.

266. JPMS claims it had an exemption from animal testing in 2017, but it has no documentation or record of that exemption.

267. JPMS was also selling and registering products in China for close to twenty years before it announced it had an exemption in 2017, a period predating the self-proclaimed exemption, and which unequivocally required animal testing.

268. Upon information and belief, JPMS's decision to claim it had a valid exemption from the animal testing requirements in China—and to continue to tout such a contrived exemption for years—was made and issued from its headquarters in California.

269. JPMS's conduct was not confined to isolated distributor activity. Internal JPMS correspondence reflects that senior JPMS leadership was directly involved in registering and marketing products in China, including discussions surrounding product approvals and relaunch marketing efforts.

270. In June of 2022, China canceled all of JPMS's active product registrations.

271. In sum, JPMS's activities in China were undertaken through domestic responsible agents formally appointed by JPMS with JPMS's direct financial support and operational oversight.

**H. Plaintiffs**

272. Plaintiff Hannah Howell currently resides in Portland, Oregon, and has purchased JPMS products in Arizona, Nevada, Oregon, and Texas.

273. Howell relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

274. Howell would not have purchased JPMS products had she known they were tested on animals.

275. Howell would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

276. Howell purchased various JPMS products for over a decade, including shampoo and conditioner, leave-in conditioner, sculpting lotion, spray gel, sculpting foam, and hairspray.

277. Before she contacted undersigned counsel on or about June 10, 2025, Howell never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

278. Howell does not agree with animal testing and actively looks for products that are cruelty-free.

279. Plaintiff Brigette Lowe currently resides in Bethel Island, California, and has purchased JPMS products in California.

280. Lowe relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

281. Lowe would not have purchased JPMS products had he/she known they were tested on animals.

282. Lowe would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

283. Lowe purchased multiple JPMS products from Walgreens, Sally Beauty, Target, and Walmart from 2015–2024, including Tea Tree Special Shampoo,

Tea Tree Special Shampoo and Conditioner, Color Protect Shampoo Forever Blonde Shampoo, Super Skinny Shampoo and Super Skinny Hair Serum. She purchased these products approximately 3 to 4 times per year.

284. Before she contacted undersigned counsel on or about July 30, 2025, Lowe never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

285. Lowe does not agree with animal testing and actively looks for products that are cruelty-free.

286. Plaintiff Robin Eisman currently resides in San Juan Capistrano, California and has purchased JPMS products in California.

287. Eisman relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

288. Eisman would not have purchased JPMS products had she known they were tested on animals.

289. Eisman would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

290. Eisman purchased JPMS products in California before May 2015 and/or after January 2020.

291. Before she contacted undersigned counsel on or about July 30, 2025, Eisman never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable

and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

292. Eisman does not agree with animal testing and actively looks for products that are cruelty-free.

293. Plaintiff Keri Lynch currently resides in San Diego, California, and has purchased JPMS products in California.

294. Lynch relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

295. Lynch would not have purchased JPMS products had she known they were tested on animals.

296. Lynch would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

297. Lynch purchased multiple JPMS products directly from Ulta and Walmart from 2012–2025. She purchased the Paul Mitchell Heat Seal and Shine Super Spray approximately twice a year.

298. Before she contacted undersigned counsel on or about July 30, 2025, Lynch never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

299. Lynch does not agree with animal testing and actively looks for products that are cruelty-free.

300. Plaintiff Kathryn Kessinger currently resides in Jeffersonville, Indiana, and has purchased JPMS products in Indiana and Kentucky.

301. Kessinger relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

302. Kessinger would not have purchased JPMS products had she known they were tested on animals.

303. Kessinger would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

304. Before she contacted undersigned counsel on or about July 31, 2025, Kessinger never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

305. Kessinger does not agree with animal testing and actively looks for products that are cruelty-free.

306. Plaintiff Hollie Shadd currently resides in Irwin, Pennsylvania, and has purchased JPMS products in Pennsylvania.

307. Shadd relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

308. Shadd would not have purchased JPMS products had she known they were tested on animals.

309. Shadd would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

310. Before she contacted undersigned counsel on or about July 31, 2025, Shadd never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

311. Shadd does not agree with animal testing and actively looks for products that are cruelty-free.

312. Plaintiff Ashley Price-Horton currently resides in Havertown, Pennsylvania, and has purchased JPMS products in Pennsylvania.

313. Price-Horton relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

314. Price-Horton would not have purchased JPMS products had she known they were tested on animals.

315. Price-Horton would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

316. Price-Horton purchased multiple JPMS products directly from CVS and Acme Food Store from 2020–2024, including Paul Mitchell Instant Moisture Daily Shampoo and Tea Tree Shampoo. She purchases these products approximately 2–3 times a year.

317. Before she contacted undersigned counsel on or about July 31, 2025, Price-Horton never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

318. Price-Horton does not agree with animal testing and actively looks for products that are cruelty-free, especially since she used to be vegan.

319. Plaintiff Gayanna Lynne Rule currently resides in Westcliffe, Colorado and has purchased JPMS products in New Jersey, Connecticut, Texas, Colorado, Florida, and Ohio.

320. Rule relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

321. Rule would not have purchased JPMS products had she known they were tested on animals.

322. Rule would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

323. Rule purchased multiple JPMS products from 2010–2016, including Paul Mitchell shampoo, conditioner, hair spray (occasionally), and the sculpting mousse (most frequently), approximately two to four times a year.

324. Before she contacted undersigned counsel on or about July 21, 2025, Rule never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and

diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

325. Rule does not agree with animal testing and actively looks for products that are cruelty-free.

326. Plaintiff Jinny Hager currently resides in Solvang, California, and has purchased JPMS products in California.

327. Hager relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

328. Hager would not have purchased JPMS products had she known they were tested on animals.

329. Hager would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

330. Hager purchased multiple JPMS products primarily from Cosmo Prof and Ulta Beauty from 2017–2025, including the Tea Tree Special Shampoo and Conditioner, and the Awapuhi Shampoo and Conditioner. She purchased these products 2–3 times a year.

331. Before she contacted undersigned counsel on or about July 30, 2025, Hager never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

332. Hager does not agree with animal testing and actively looks for products that are cruelty-free.

333. Plaintiff Kimbrelle Rodgers currently resides in Batesburg, South Carolina, and has purchased JPMS products in South Carolina and Mississippi.

334. Rodgers relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

335. Rodgers would not have purchased JPMS products had she known they were tested on animals.

336. Rodgers would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

337. Before she contacted undersigned counsel on or about August 22, 2025, Rodgers never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

338. Rodgers does not agree with animal testing and actively looks for products that are cruelty-free.

339. Plaintiff Denise Smith currently resides in Salt Lake City, Utah, and has purchased JPMS products in Utah.

340. Smith relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

341. Smith would not have purchased JPMS products had she known they were tested on animals.

342. Smith would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

343. Before she contacted undersigned counsel on or about August 22, 2025, Smith never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

344. Smith does not agree with animal testing and actively looks for products that are cruelty-free.

345. Plaintiff Katelyn Dias currently resides in Cleveland, Tennessee, and has purchased JPMS products in Tennessee.

346. Dias relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing. She recalls seeing the cruelty-free bunny logo on the bottles and cruelty-free advertising.

347. Dias would not have purchased JPMS products had she known they were tested on animals.

348. Dias would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

349. Dias primarily purchased JPMS products from hair salons and occasionally from Sally Beauty.

350. Before she contacted undersigned counsel on or about August 25, 2025, Dias never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

351. Dias does not agree with animal testing and actively looks for products that are cruelty-free.

352. Plaintiff Deanna Harrell currently resides in Knoxville, Tennessee, and has purchased JPMS products in Tennessee.

353. Harrell relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

354. Harrell would not have purchased JPMS products had she known they were tested on animals.

355. Harrell would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

356. Harrell purchased JPMS products from hair salons, Walmart, and CVS stores.

357. Before she contacted undersigned counsel on or about August 25, 2025, Harrell never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

358. Harrell does not agree with animal testing and actively looks for products that are cruelty-free.

359. Plaintiff Lauren Carr currently resides in Chicago, Illinois, and has purchased JPMS products in Illinois and Michigan.

360. Carr relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

361. Carr would not have purchased JPMS products had she known they were tested on animals.

362. Carr would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

363. Before she contacted undersigned counsel on or about September 16, 2025, Carr never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

364. Carr does not agree with animal testing and actively looks for products that are cruelty-free.

365. Plaintiff Kerri Parker currently resides in Ogden, Utah, and has purchased JPMS products in Utah.

366. Parker relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

367. Parker would not have purchased JPMS products had she known they were tested on animals.

368. Parker would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

369. Before she contacted undersigned counsel on or about August 22, 2025, Parker never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

370. Parker does not agree with animal testing and actively looks for products that are cruelty-free.

371. Plaintiff Aliki Marinos currently resides in Glenview, Illinois, and has purchased JPMS products in Illinois.

372. Marinos relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

373. Marinos would not have purchased JPMS products had she known they were tested on animals.

374. Marinos would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

375. Marinos purchased multiple JPMS products primarily from T.J. Maxx in 2020, including the Paul Mitchell Shampoo and Conditioner.

376. Before she contacted undersigned counsel on or about September 16, 2025, Marinos never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered

reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

377. Marinos does not agree with animal testing and actively looks for products that are cruelty-free.

378. Plaintiff Lynette Armstrong currently resides in Griffin, Georgia, and has purchased JPMS products in Georgia and California.

379. Armstrong relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

380. Armstrong would not have purchased JPMS products had she known they were tested on animals.

381. Armstrong would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

382. Armstrong purchased multiple JPMS products directly from the Paul Mitchell website and from independent retailers from 1998–2015, including Awapuhi Botanical Color Care Conditioner, Sculpting Styling products, and Tea Tree products. She purchased these products about twelve times per year.

383. Before she contacted undersigned counsel on or about September 19, 2025, Armstrong never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

384. Armstrong does not agree with animal testing and actively looks for products that are cruelty-free.

385. Plaintiff Jake Tulogeski currently resides in Appleton, Wisconsin, and has purchased JPMS products in Wisconsin.

386. Tulogeski relied on JPMS's representations that the products he was purchasing were not tested on animals and that JPMS did not perform animal testing.

387. Tulogeski would not have purchased JPMS products had he known they were tested on animals.

388. Tulogeski would not have continued to purchase JPMS products had he known JPMS tested any of its products on animals, regardless of where that testing occurred.

389. Before he contacted undersigned counsel on or about October 8, 2025, Tulogeski never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

390. Tulogeski does not agree with animal testing and actively looks for products that are cruelty-free.

391. Plaintiff Mark Geis currently resides in Eagle River, Wisconsin, and has purchased JPMS products in Wisconsin, Texas, Florida, and Hawaii.

392. Geis relied on JPMS's representations that the products he was purchasing were not tested on animals and that JPMS did not perform animal testing.

393. Geis would not have purchased JPMS products had he known they were tested on animals.

394. Geis would not have continued to purchase JPMS products had he known JPMS tested any of its products on animals, regardless of where that testing occurred.

395. Before he contacted undersigned counsel on or about October 8, 2025, Geis never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

396. Geis does not agree with animal testing and actively looks for products that are cruelty-free.

397. Plaintiff Kelly Dugas currently resides in Waltham, Massachusetts, and has purchased JPMS products in Massachusetts.

398. Dugas relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

399. Dugas would not have purchased JPMS products had she known they were tested on animals.

400. Dugas would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

401. Before she contacted undersigned counsel on or about October 8, 2025, Dugas never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

402. Dugas does not agree with animal testing and actively looks for products that are cruelty-free.

403. Plaintiff Julie Dziekan currently resides in West Allis, Wisconsin, and has purchased JPMS products in Wisconsin.

404. Dziekan relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

405. Dziekan would not have purchased JPMS products had she known they were tested on animals.

406. Dziekan would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

407. Before she contacted undersigned counsel on or about October 8, 2025, Dziekan never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

408. Dziekan does not agree with animal testing and actively looks for products that are cruelty-free.

409. Plaintiff Erin Coyle currently resides in Cornelia, Georgia, and has purchased JPMS products in Georgia.

410. Coyle relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

411. Coyle would not have purchased JPMS products had she known they were tested on animals.

412. Coyle would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

413. Coyle purchased multiple JPMS products, including the Paul Mitchell Freeze and Shine Hairspray.

414. Before she contacted undersigned counsel on or about August 22, 2025, Coyle never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

415. Coyle does not agree with animal testing and actively looks for products that are cruelty-free.

416. Plaintiff Leila Mello currently resides in Fall River, Massachusetts, and has purchased JPMS products in Massachusetts.

417. Mello relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

418. Mello would not have purchased JPMS products had she known they were tested on animals.

419. Mello would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

420. Before she contacted undersigned counsel on or about October 8, 2025, Mello never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and

diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

421. Mello does not agree with animal testing and actively looks for products that are cruelty-free.

422. Plaintiff Kimberly Weatherbee currently resides in Hyde Park, Massachusetts, and has purchased JPMS products in Florida, Massachusetts, New Hampshire, and Rhode Island.

423. Weatherbee relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

424. Weatherbee would not have purchased JPMS products had she known they were tested on animals.

425. Weatherbee would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

426. Before she contacted undersigned counsel on or about November 6, 2025, Weatherbee never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

427. Weatherbee does not agree with animal testing and actively looks for products that are cruelty-free.

428. Plaintiff Kristy Creech (formerly Bennett) currently resides in East Bend, North Carolina, and has purchased JPMS products in North Carolina.

429. Creech relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

430. Creech would not have purchased JPMS products had she known they were tested on animals.

431. Creech would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

432. Before she contacted undersigned counsel on or about November 6, 2025, Creech never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

433. Creech does not agree with animal testing and actively looks for products that are cruelty-free.

434. Plaintiff Kim Davis currently resides in Savage, Minnesota and has purchased JPMS products in Minnesota.

435. Davis relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

436. Davis would not have purchased JPMS products had she known they were tested on animals.

437. Davis would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

438. Before she contacted undersigned counsel on or about November 6, 2025, Davis never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

439. Davis does not agree with animal testing and actively looks for products that are cruelty-free.

440. Plaintiff Isabelle Salhani currently resides in Chicago, Illinois, and has purchased JPMS products in Virginia, and California.

441. Salhani relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

442. Salhani would not have purchased JPMS products had she known they were tested on animals.

443. Salhani would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

444. Salhani purchased multiple JPMS products directly from Sally's Beauty Supply and through a past hairstylist at a hair salon, from 2008–2014.

445. Before she contacted undersigned counsel on or about November 6, 2025, Salhani never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

446. Salhani does not agree with animal testing and actively looks for products that are cruelty-free.

447. Plaintiff Terasa Rowe currently resides in Augusta, Georgia, and has purchased JPMS products in Georgia, California, and Oklahoma.

448. Rowe relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

449. Rowe would not have purchased JPMS products had she known they were tested on animals.

450. Rowe would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

451. Rowe began purchasing JPMS products directly from a friend who was a hairstylist. She purchased JPMS products beginning in 1985 until a few years ago. She has repeatedly purchased the Shampoo One, The Conditioner, and the Awapuhi Shampoo.

452. Before she contacted undersigned counsel on or about August 22, 2025, Rowe never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

453. Rowe does not agree with animal testing and actively looks for products that are cruelty-free.

454. Plaintiff Susana Veach currently resides in Mesquite, Nevada, and has purchased JPMS products in Idaho and Nevada.

455. Veach relied on JPMS's representations that the products she was purchasing were not tested on animals and that JPMS did not perform animal testing.

456. Veach would not have purchased JPMS products had she known they were tested on animals.

457. Veach would not have continued to purchase JPMS products had she known JPMS tested any of its products on animals, regardless of where that testing occurred.

458. Before she contacted undersigned counsel on or about November 7, 2025, Veach never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

459. Veach does not agree with animal testing and actively looks for products that are cruelty-free.

460. Plaintiff Anthony Francesconi currently resides in La Grande, Oregon, and has purchased JPMS products in Idaho, Oregon, and Montana.

461. Francesconi was aware of JPMS's representations that the products he was purchasing were not tested on animals and that JPMS did not perform animal testing.

462. Francesconi would not have purchased JPMS products had he known they were tested on animals.

463. Francesconi would not have continued to purchase JPMS products had he known JPMS tested any of its products on animals, regardless of where that testing occurred.

464. Francesconi began purchasing JPMS products in 1998 until January of 2025. He purchased the Tea Tree shampoo, Paul Mitchell Shampoo and Conditioner, and styling hair gel at least twice a year. He purchased these products at hair salons, and various other third-party retailers, including Walmart.

465. Before he contacted undersigned counsel on or about November 7, 2025, Francesconi never had any actual knowledge that JPMS was engaged in animal testing, and no inquiry or investigation, within the bounds of what is considered reasonable and diligent under the circumstances, would have uncovered facts or evidence demonstrating that JPMS tested on animals.

466. Francesconi does not agree with animal testing and actively looks for products that are cruelty-free.

## V. CLASS ACTION ALLEGATIONS

467. Plaintiffs bring this action under Federal Rule of Civil Procedure 23(b)(3) individually and for these Classes of similarly situated individuals:

> **Arizona Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Arizona.
>
> **California Class**: All individuals who, between June 1, 2001, and April 30, 2015, and between January 1, 2020 to the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in California.
>
> **Colorado Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Colorado.

**Florida Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Florida.

**Georgia Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Georgia.

**Hawaii Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Hawaii.

**Idaho Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Idaho.

**Illinois Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Illinois.

**Indiana Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Indiana.

**Massachusetts Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Massachusetts.

**Michigan Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Michigan.

**Minnesota Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or

through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Minnesota.

**Nevada Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Nevada.

**New Hampshire Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in New Hampshire.

**New Jersey Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in New Jersey.

**North Carolina Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in North Carolina.

**Ohio Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Ohio.

**Oklahoma Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Oklahoma.

**Oregon Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Oregon.

**Pennsylvania Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Pennsylvania.

> **Rhode Island Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Rhode Island.
>
> **South Carolina Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in South Carolina.
>
> **Tennessee Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Tennessee.
>
> **Texas Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Texas.
>
> **Utah Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Utah.
>
> **Virginia Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Virginia.
>
> **Wisconsin Class**: All individuals who, between June 1, 2001, and the present, purchased, directly from JPMS or through a third-party retailer or salon, a John Paul Mitchell Systems hair-care product in Wisconsin.

468. Excluded from the Classes are JPMS and its co-conspirators, their officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliated companies; Class counsel and their employees; and the judicial officers and their immediate family members and associated court staff

assigned to this case, and all persons within the third degree of relationship to any such persons. The Class is clear and ascertainable using the objective criterion of purchases, which can be proven using Defendant's business records. For further clarity, as used above, styling tools are not "hair-care products," and thus any such purchase does not alone render a purchaser a member of the Class.

### A. The Requirements of Rule 23(a)(1)-(4) Are Satisfied

#### 1. Numerosity

469. The Class is so numerous that joinder of all members is unfeasible and impracticable. JPMS sells millions of products each year in hundreds of locations. The exact size of the Class is easily ascertainable, as each transaction or purchase can be tracked using Defendant's business records. Any reasonable estimate, based on sales, indicates there are millions of Class members.

#### 2. Commonality

470. Common questions of law and fact exist as to all Class members, which include, but are not limited to:

a. Whether Defendant stated or promised on all its hair-care products that its hair-care products were cruelty free or never tested on animals;

b. Whether Defendant advertised its hair-care products by stating that it never tested on animals and that it was cruelty free;

c. Whether Defendant performed animal testing, or had animal testing performed on its behalf, on hair-care products to sell them in China;

d. Whether Defendant misrepresented that it had an exemption from animal testing to sell hair-care products in China;

e. Whether Defendant delivered hair-care products to the Class that met its "cruelty free" promise;

f. Whether Defendant delivered hair-care products to the Class that met its promise to never test on animals;

g. Whether Defendant breached its express warranties with the Class members;

h. Whether Defendant is liable under each of the causes of action alleged herein; and

i. Whether the Class members were damaged by paying more for hair-care products than they would have if the truth had been disclosed, and, if so, by what amount.

**3. Typicality**

471. Plaintiffs' claims are typical of the claims of the other members in their respective Classes, as they arise out of the uniform and pervasive conduct of Defendant, involve the same legal theories, and challenge the same practices of Defendant. Plaintiffs and all Class members have been subjected to the same falsehoods and practices, hold the same rights, are entitled to the same legal and equitable relief, have suffered the same impact and injury, and sustained similar damage by paying an amount for hair-care products that they would not have paid or greater than that which they would have paid had JPMS not affirmatively misrepresented that its hair-care products were cruelty free and never tested on animals.

**4. Adequacy**

472. Plaintiffs and their counsel will fairly and adequately represent the interests of the Class members. Plaintiffs have no interests antagonistic to, or in conflict with, the interests of the other Class members, and they will zealously pursue their claims. Plaintiffs' lawyers are highly experienced in the prosecution of consumer class actions and complex commercial litigation, capable of providing the

financial resources needed to litigate this matter to conclusion, and have litigated other consumer rights matters in a class context.

**B. The Requirements of Rule 23(b)(3) are Satisfied**

**1. Predominance**

473. Class certification is appropriate under Federal Rule of Civil Procedure 23(b)(3) because the questions of law or fact common to Class members predominate over any questions affecting only individual members. The proposed Classes are sufficiently cohesive to warrant adjudication by representation. Liability will be shown by common representations, acts, and promises, the proof of which every Class member could use to prove liability. Damages are capable of classwide measurement through well-accepted methodologies including conjoint analysis or hedonic regression to isolate the market price premium attributable to JPMS's cruelty-free representations, as will be established through expert testimony at class certification, even though individual differences in damages does not preclude certification.

**2. Superiority**

474. A class action is superior to all other available methods for fairly and efficiently adjudicating the claims of Plaintiffs and the Class members. Plaintiffs and the Class members—many of whom are unaware of their rights—have been harmed by Defendant’s misrepresentations. Litigating this case as a class action reduces the possibility of repetitious litigation relating to Defendant’s wrongful actions and provides an efficient mechanism for adjudication for Class members, whose claims are too small to warrant individual litigation.

## VI. TOLLING OF STATUTE OF LIMITATIONS

475. The statutes of limitation applicable to Plaintiffs' claims are tolled as a result of Defendant's knowing and active concealment of the alleged conduct, including its own affirmative statements alleged herein, such as its representations to PETA and the public in 2012 and 2013 that it was in early registration attempts in China, its continued representation to PETA that it was not selling in China to stay on PETA's cruelty-free list, and its statements starting in 2017 that it had an exemption from animal testing in China. Plaintiffs did not and could not have reasonably discovered that Defendant was testing on animals in China because Defendant falsely represented that it never animal tested, and that it was in early registration attempts in China, or that it had an exemption from animal testing in China that it did not have.

476. Plaintiffs' claims are therefore tolled under the discovery rule.

477. The causes of action alleged herein did not accrue until Plaintiffs discovered or should have discovered that JPMS was testing on animal in China.

478. To this day, JPMS does not disclose and continues to deny that it tested on animals in China.

479. Plaintiffs and other Class members could not have learned about the full extent of Defendant's misconduct through the exercise of reasonable diligence, especially with Defendant working to conceal its animal testing in China.

480. For most JPMS purchasers, they are still unaware that JPMS ever tested on animals in China, making the discovery rule appropriate.

481. For these reasons, all applicable statutes of limitations have been tolled by the operation of the discovery rule.

## VII. COUNTS

### A. Arizona Causes of Action for Arizona Class Alleged by Plaintiff Hannah Howell ("Arizona Plaintiff")

**COUNT I**
**CONSUMER FRAUD ACT**
**ARIZ. REV. STAT. § 44-1521 *et seq.***

482. Arizona Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

483. JPMS sells hair-care products, which qualify as "merchandise" under Ariz. Rev. Stat. § 44-1521(5).

484. Arizona Plaintiff and the Arizona Class members purchased various JPMS hair-care products in Arizona during the applicable class period.

485. Arizona Plaintiff's and the Class members' purchases qualify as "sales" under Ariz. Rev. Stat. § 44-1521(7).

486. It is an unlawful practice under Arizona Revised Statutes § 44-1522 to use or employ any "deception, deceptive or unfair act or practice, fraud, false pretense, false promise, misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely on such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby."

487. JPMS engaged in unfair or deceptive acts or practices that violated the Arizona Consumer Fraud Act, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption

from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

488. JPMS's actions occurred in the sale of goods to Arizona Plaintiff and the Arizona Class.

489. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

490. In purchasing JPMS products, Arizona Plaintiff and the Arizona Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

491. Had Arizona Plaintiff and the other Arizona Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

492. Arizona Plaintiff and the Arizona Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

493. JPMS's misrepresentations were material.

494. Because of JPMS's unfair practice, Arizona Plaintiff and the Arizona Class have suffered actual damages in an amount to be proven at trial.

**B. California Causes of Action Alleged by Plaintiffs Robin Eisman, Keri Lynch, Brigette Lowe, Jinny Hager, Terasa Rowe, Lynette Armstrong, and Isabelle Salhani ("California Plaintiffs")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE CALIFORNIA UNIFORM COMMERCIAL CODE**

495. California Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

496. JPMS sells hair-care products, which qualify as goods under the California Uniform Commercial Code. Cal. Com. Code § 2105.

497. California Plaintiffs and the California Class purchased various JPMS hair-care products during the applicable Class period.

498. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and/or were cruelty free. Cal. Com. Code §2313.

499. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or it was a cruelty-free company. Cal. Com. Code §2313.

500. JPMS's representations were part of the basis of the bargain with California Plaintiffs and the California Class.

501. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

502. California Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after California Plaintiffs discovered the breach.

503. Because of JPMS's breach of its express warranty, California Plaintiffs and the California Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Cal. Com. Code § 2714.

**COUNT II**
**VIOLATION OF THE CALIFORNIA CONSUMERS LEGAL REMEDIES ACT (CLRA) CAL. CIV. CODE § 1750, *et seq.***

504. California Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

505. JPMS is a "person" under Cal. Civ. Code § 1761(c).

506. California Plaintiffs are "consumers" under Cal. Civ. Code § 1761(d), who purchased JPMS hair-care products.

507. JPMS hair-care products are "goods" used for "personal, family, or household purposes" under Cal. Civ. Code § 1761(a).

508. California Plaintiffs' purchases of JPMS products are "transactions" under Cal. Civ. Code § 1761(e).

509. The CLRA prohibits the following "unfair methods of competition and unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer":

a. "Misrepresenting the source, sponsorship, approval, or certification of goods or service" (Cal. Civ. Code § 1770(a)(2));

b. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another" (Cal. Civ. Code § 1770(a)(7)); and

c. "Advertising goods or services with intent not to sell them as advertised." Cal. Civ. Code § 1770(a)(9).

510. JPMS engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1770(a), as described herein, by representing and certifying that its hair-care products are cruelty free and never tested on animals when they were tested on animals, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

511. JPMS's actions occurred in the sale of goods to a consumer.

512. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, as set forth, were material and likely to deceive a reasonable consumer.

513. In purchasing JPMS products, California Plaintiffs and the California Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

514. Had California Plaintiffs and the other California Class members known they would not receive products that had never been animal tested, they would not have purchased JPMS's hair-care products and/or paid as much for them.

515. California Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing in JPMS's products.

516. Under Cal. Civ. Code § 1780(a)(1), California Plaintiffs, individually and on behalf of the other California Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the CLRA as alleged.

517. California Plaintiffs, individually and on behalf of the other California Class members, seek punitive damages against Defendant under Cal. Civ. Code § 1780(a)(4) because they willfully and consciously disregarded the rights of California Plaintiffs and the California Class. Defendant intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free. Defendant's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages under Cal. Civ. Code § 3294.

518. California Plaintiffs, individually and on behalf of the other California Class members, seek costs of court, attorneys' fees under Cal. Civ. Code § 1780(e), and any other just and proper relief available under the CLRA.

519. California Plaintiffs, for themselves and as representatives of the California Class, sent a notice and demand over thirty days before bringing suit, as specified by Cal. Civ. Code § 1782(a), and JPMS has not offered a correction, repair, replacement, or remedy.

## COUNT III
## VIOLATION OF CALIFORNIA'S FALSE ADVERTISING LAW
## CAL. BUS. & PROF. CODE § 17500, *et seq.*

520. California Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

521. Cal. Bus. & Prof. Code § 17500 makes it unlawful for a company to induce the public to enter into an obligation related to personal property with a statement made in advertising, marketing, or publication, including any statement made on the internet, it knows is untrue or misleading, or with the exercise of reasonable care should know is untrue or misleading.

522. JPMS caused to be made or disseminated through California and the United States, through advertising, marketing, social media, product labels, and other publications, statements that were untrue or misleading, and which were known, or which, if exercising reasonable care, would have been known to JPMS, to be untrue and misleading to consumers, including to California Plaintiffs and the other California Class members.

523. JPMS violated Cal. Bus. & Prof. Code § 17500 because the misrepresentations that JPMS's hair products had never been tested on animals and were cruelty free, as set forth, were material and likely to deceive a reasonable consumer.

524. JPMS made the misrepresentations with the intent to sell hair-care products.

525. California Plaintiffs and the other California Class members have suffered an injury in fact, including the loss of money or property, because of Defendant's unfair, unlawful, and/or deceptive practices.

526. In purchasing JPMS products, California Plaintiffs and the other California Class members relied on JPMS's misrepresentations that it had never tested on animals, that it was a cruelty-free company, that its products were cruelty free, and that its products were never tested on animals. JPMS's representations

turned out not to be true because it tested on animals to sell its products in China. Had California Plaintiffs and the other California Class members known this, they would not have purchased the hair-care products and/or paid as much for them. Plaintiffs and the other Class members overpaid for their hair-care products and did not receive the benefit of their bargain.

527. California Plaintiffs, individually and on behalf of the other California Class members, request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and the other California Class members any money Defendant acquired by false advertising, via restitution or disgorgement, and for any other just and proper relief.

## COUNT IV
## VIOLATION OF THE CALIFORNIA UNFAIR COMPETITION LAW
## CAL. BUS. & PROF. CODE § 17200, *ET SEQ.*

528. California Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

529. California's Unfair Competition Law ("UCL"), Cal. Bus. & Prof. Code § 17200, *et seq.*, proscribes acts of unfair competition, including "any unlawful, unfair or fraudulent business act or practice and unfair, deceptive, untrue or misleading advertising."

530. **Unlawful Act.** Defendant's conduct constitutes an unlawful business practice in violation of the UCL, because Defendant has violated California's Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, and California's False Advertising Law, Cal. Bus. & Prof. Code § 17500, *et seq.*

531. **Unfair Act.** Defendant's conduct constitutes an unfair business practice in violation of the UCL in, at a minimum, these ways:

a. By marketing its products as being cruelty free and never tested on animals when JPMS tests on animals;

b. by labeling its products as cruelty free and never tested on animals when it does test on animals;

c. by promising consumers that it was a cruelty-free company and that it never tests on animals;

d. by representing on its products that they are cruelty free and never tested on animals; and

e. by claiming to have an exemption to sell in China that does not require animal testing when no such exemption exists.

532. **Unfair, Deceptive, Untrue or Misleading Advertising.** Defendant's conduct constitutes an unfair, deceptive, untrue, or misleading advertising in violation of the UCL in, at a minimum, these ways:

a. Advertising on its website and social media accounts that its products are cruelty free and never tested on animals; and

b. placing labels on its products representing that its products are cruelty free and never tested on animals and that JPMS is a cruelty-free company and never tests on animals.

533. Defendant falsely advertised with the intent to sell its hair-care products.

534. Defendant knew, or should have known, that these representations were false.

535. JPMS's misrepresentations caused California Plaintiffs and the other California Class members to purchase or pay more for JPMS hair-care products.

Absent those misrepresentations, California Plaintiffs and the other California Class members would not have purchased the JPMS products.

536. California Plaintiffs and the other California Class members have suffered injury in fact, including lost money and undesirable merchandise, as a result of Defendant's misrepresentations.

537. California Plaintiffs, individually and on behalf of the other California Class members, request that this Court enter such orders or judgments as may be necessary to restore to California Plaintiffs and members of the California Class via restitution or disgorgement, any monies Defendant acquired by unfair competition, as provided by Cal. Bus. & Prof. Code § 17203; and for such other relief as may be just and proper.

**C. Colorado Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("Colorado Plaintiff")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE COLORADO UNIFORM COMMERCIAL CODE**

538. Colorado Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

539. JPMS sells hair-care products, which qualify as goods under the Colorado Uniform Commercial Code. Colo. Rev. Stat. § 4-2-105.

540. Colorado Plaintiff and the Colorado Class purchased various JPMS hair-care products during the applicable Class period.

541. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and/or were cruelty free. Colo. Rev. Stat. § 4-2-313.

542. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or it was a cruelty-free company. Colo. Rev. Stat. §4-2-313.

543. JPMS's representations were part of the basis of the bargain with Colorado Plaintiff and the Colorado Class.

544. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

545. Colorado Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Colorado Plaintiff discovered the breach. Colo. Rev. Stat. § 4-2-607.

546. Because of JPMS's breach of its express warranty, Colorado Plaintiff and the Colorado Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Colo. Rev. Stat. § 4-2-714.

**COUNT II**
**COLORADO CONSUMER PROTECTION ACT**
**("Colorado CPA")**

547. Colorado Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

548. JPMS, Colorado Plaintiff, and the Colorado Class are all "person(s)" under Colorado Revised Statute § 6-1-102(6).

549. JPMS is engaged in "sales" under Colorado Revised Statute § 6-1-102(10).

550. The Colorado CPA provides that it is a "deceptive trade practice when, in the course of the person's business, vocation, or occupation, the person":

a. "Either knowingly or recklessly makes a false representation as to the source, sponsorship, approval, or certification of goods, services, or property";

b. "Either knowingly or recklessly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations, or quantities of goods, food, services, or property or a false representation as to the sponsorship, approval, status, affiliation, or connection of a person therewith"; and

c. "Represents that goods, food, services, or property are of a particular standard, quality, or grade, or that goods are of a particular style or model, if he knows or should know that they are of another." Colo. Rev. Stat. § 6-1-105.

551. JPMS engaged in unfair or deceptive acts or practices that violated the Colorado CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

552. JPMS's actions occurred in the sale of goods to Colorado Plaintiff and the Colorado Class.

553. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

554. In purchasing JPMS products, Colorado Plaintiff and the Colorado Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

555. Had Colorado Plaintiff and the other Colorado Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

556. Colorado Plaintiff and the Colorado Class suffered an ascertainable loss caused by JPMS's misrepresentations that its products were not tested on animals and/or were cruelty free.

557. Under the Colorado CPA, Colorado Plaintiff, individually and on behalf of the other Colorado Class members, seeks actual damages against JPMS for the harm caused by JPMS's violations of the Colorado CPA as alleged. Colo. Rev. Stat. § 6-1-113.

558. Colorado Plaintiff, individually and on behalf of the other Colorado Class members, seeks costs of court, attorneys' fees under Colorado Revised Statute § 6-1-113, and any other just and proper relief available under the Colorado CPA.

## D. Florida Causes of Action Alleged by Plaintiffs Gayanna Lynne Rule, Mark Geis, and Kimberly Weatherbee ("Florida Plaintiffs")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE FLORIDA UNIFORM COMMERCIAL CODE

559. Florida Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

560. JPMS sells hair-care products, which qualify as goods under the Florida Uniform Commercial Code. Fla. Stat. § 672.105.

561. Florida Plaintiffs and the Florida Class purchased various JPMS hair-care products during the applicable Class period.

562. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and/or were cruelty free. Fla. Stat. § 672.313.

563. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or it was a cruelty-free company. Fla. Stat. § 672.313.

564. JPMS's representations were part of the basis of the bargain with Florida Plaintiffs and the Florida Class.

565. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

566. Florida Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Florida Plaintiffs discovered the breach. Fla. Stat. § 672.607.

567. Because of JPMS's breach of its express warranty, Florida Plaintiffs and the Florida Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Fla. Stat. § 672.714.

**COUNT II**
**FLORIDA DECEPTIVE AND UNFAIR TRADE PRACTICES ACT**
**("Florida DUTPA")**

568. Florida Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

569. Florida Plaintiffs and the Florida Class are all "consumers" under Florida Statute § 501.203(7).

570. JPMS is engaged in "trade or commerce" under Florida Statute § 501.203(8).

571. The Florida DUTPA makes "Unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." Fla. Stat. § 501.204(1).

572. JPMS engaged in unfair or deceptive acts or practices that violated the Florida DUTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

573. JPMS's actions occurred in the sale of goods to Florida Plaintiffs and the Florida Class.

574. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

575. In purchasing JPMS products, Florida Plaintiffs and the Florida Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

576. Had Florida Plaintiffs and the other Florida Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

577. Florida Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

578. Under Florida Statute § 501.211, Florida Plaintiffs, individually and on behalf of the other Florida Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the Florida DUTPA as alleged herein.

579. Florida Plaintiffs, individually and on behalf of the other Florida Class members, seek costs of court, attorneys' fees under Florida Statutes §§ 501.2105 and 501.211, and any other just and proper relief available under the Florida DUTPA.

**E. Georgia Causes of Action Alleged by Plaintiffs Lynette Armstrong, Erin Coyle, and Terasa Rowe ("Georgia Plaintiffs")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE GEORGIA UNIFORM COMMERCIAL CODE**

580. Georgia Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

581. JPMS sells hair-care products, which qualify as goods under the Georgia Uniform Commercial Code. Ga. Code § 11-2-105.

582. Georgia Plaintiffs and the Georgia Class purchased various JPMS hair-care products during the applicable Class period.

583. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and/or were cruelty free. Ga. Code § 11-2-313.

584. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or it was a cruelty-free company. *Id.*

585. JPMS's representations were part of the basis of the bargain with Georgia Plaintiffs and the Georgia Class.

586. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

587. Georgia Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Georgia Plaintiffs discovered the breach. Ga. Code § 11-2-607.

588. Because of JPMS's breach of its express warranty, Georgia Plaintiffs and the Georgia Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Ga. Code § 11-2-714.

**COUNT II**
**GEORGIA FAIR BUSINESS PRACTICES ACT ("Georgia FBPA")**

589. Georgia Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

590. JPMS, Georgia Plaintiffs, and the Georgia Class are all "persons" under Georgia Code § 10-1-392(a)(24).

591. Georgia Plaintiffs and the Georgia Class are all "consumers" under Georgia Code § 10-1-392(a)(6).

592. Georgia Plaintiffs and the Georgia Class engaged in "consumer transactions" when purchasing JPMS products under Georgia Code § 10-1-392(a)(10).

593. JPMS is engaged in "consumer acts or practices" under Georgia Code § 10-1-392(a)(7).

594. JPMS is engaged in "trade" and "commerce" under Georgia Code § 10-1-392(a)(28).

595. Under Georgia Code § 10-1-393 "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce are declared unlawful," including:

a. "Causing actual confusion or actual misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have"; and

c. "Representing that goods or services are of a particular standard, quality, or grade or that goods are of a particular style or model, if they are of another."

596. JPMS engaged in unfair or deceptive acts or practices that violated the Georgia FBPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

597. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

598. In purchasing JPMS products, Georgia Plaintiffs and the Georgia Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

599. Had Georgia Plaintiffs and the other Georgia Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

600. Georgia Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

601. Under Georgia Code § 10-1-399(a), Georgia Plaintiffs, individually and on behalf of the other Georgia Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the Georgia FBPA as alleged herein.

602. Georgia Plaintiffs, individually and on behalf of the other Georgia Class members, seek exemplary damages against Defendant under Georgia Code § 10-1-399(a) because they intentionally disregarded the rights of Georgia Plaintiffs and the Georgia Class. JPMS intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free.

603. Georgia Plaintiffs, individually and on behalf of the other Georgia Class members, seek costs of court, attorneys' fees under Georgia Code § 10-1-399(d), and any other just and proper relief available under the Georgia CFBA.

604. Georgia Plaintiffs, for themselves and as representatives of the Georgia Class, sent a notice and demand over thirty days before bringing suit, as specified by Georgia Code § 10-1-399(b).

**F. Hawaii Causes of Action Alleged by Plaintiff Mark Geis ("Hawaii Plaintiff")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE HAWAII UNIFORM COMMERCIAL CODE**

605. Hawaii Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

606. JPMS sells hair-care products, which qualify as goods under the Hawaii Uniform Commercial Code. Haw. Rev. Stat. § 490:2-105(1).

607. Hawaii Plaintiff and the Hawaii Class purchased various JPMS hair-care products during the applicable Class period.

608. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and/or were cruelty free. Haw. Rev. Stat. § 490:2-313.

*609.* In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

610. JPMS's representations were part of the basis of the bargain with Hawaii Plaintiff and the Hawaii Class.

611. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

612. Hawaii Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Hawaii Plaintiff discovered the breach. Haw. Rev. Stat. § 490:2-607.

613. Because of JPMS's breach of its express warranty, Hawaii Plaintiff and the Hawaii Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Haw. Rev. Stat. § 490:2-714.

**COUNT II**
**HAWAII UNFAIR DECEPTIVE ACTS OR PRACTICES**
**("Hawaii UDAP")**

614. Hawaii Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

615. Hawaii Plaintiff and the Hawaii Class are all "consumers" under Hawaii Revised Statute § 480-1.

616. JPMS, Hawaii Plaintiff, and the Hawaii Class are all "persons" under Hawaii Revised Statute § 480-1.

617. JPMS hair-care products are "commodities" under Hawaii Revised Statute § 480-1.

618. The Hawaii UDAP makes "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful." Hawaii Revised Statute § 480-2(a).

619. JPMS engaged in unfair or deceptive acts or practices that violated the Hawaii UDAP, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

620. JPMS's actions occurred in the sale of goods to Hawaii Plaintiff and the Hawaii Class.

621. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

622. In purchasing JPMS products, Hawaii Plaintiff and the Hawaii Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

623. Had Hawaii Plaintiff and the other Hawaii Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

624. Hawaii Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

625. Under Hawaii Revised Statutes § 480-13(b)–(c), Hawaii Plaintiff, individually and on behalf of the other Hawaii Class members, seeks actual damages and threefold actual damages against JPMS for the harm caused by JPMS's violations of the Hawaii UDAP as alleged.

626. Hawaii Plaintiff, individually and on behalf of the other Hawaii Class members, seeks costs and attorneys' fees under Hawaii Revised Statute § 480-13(b), and any other just and proper relief available under the Hawaii UDAP.

**G. Idaho Causes of Action Alleged by Plaintiffs Susan Veach and Anthony Francesconi ("Idaho Plaintiffs")**

**COUNT I**
**IDAHO CONSUMER PROTECTION ACT ("Idaho CPA")**

627. Idaho Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

628. JPMS, Idaho Plaintiffs, and the Idaho Class are all "persons" under Idaho Code § 48-602(1).

629. JPMS is engaged in "trade" or "commerce" under Idaho Code § 48-602(2).

630. JPMS hair-care products are "goods" under Idaho Code § 48-602(6).

631. The Idaho CPA makes "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce . . . unlawful," including:

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, connection, qualifications or license that he does not have"; and

c. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Idaho Code § 48-603.

632. JPMS engaged in unfair or deceptive acts or practices that violated the Idaho CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

633. JPMS's actions occurred in the sale of goods to Idaho Plaintiffs and the Idaho Class.

634. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

635. In purchasing JPMS products, Idaho Plaintiffs and the Idaho Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

636. Had Idaho Plaintiffs and the other Idaho Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

637. Idaho Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

638. Idaho Plaintiffs, individually and on behalf of the other Idaho Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the Idaho CPA as alleged herein. Idaho Code § 48-608.

639. Idaho Plaintiffs, individually and on behalf of the other Idaho Class members, seek punitive damages against Defendant under Idaho Code § 48-608 because they willfully and consciously disregarded the rights of Idaho Plaintiffs and the Idaho Class. JPMS intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free.

640. Idaho Plaintiffs, individually and on behalf of the other Idaho Class members, seek costs of court, attorneys' fees under Idaho Code § 48-608, and any other just and proper relief available under the Idaho CPA.

## H. Illinois Causes of Action Alleged by Plaintiffs Lauren Carr and Aliki Marinos ("Illinois Plaintiffs")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE ILLINOIS UNIFORM COMMERCIAL CODE

641. Illinois Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

642. JPMS sells hair-care products, which qualify as goods under the Illinois Uniform Commercial Code. 810 Ill. Comp. Stat. 5/2-105.

643. Illinois Plaintiffs and the Illinois Class purchased various JPMS hair-care products during the applicable Class period.

644. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. 810 Ill. Comp. Stat. 5/2-313.

645. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. 810 Ill. Comp. Stat. 5/2-313.

646. JPMS's representations were part of the basis of the bargain with Illinois Plaintiffs and the Illinois Class.

647. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

648. Illinois Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Illinois Plaintiffs discovered the breach. 810 Ill. Comp. Stat. 5/2-607.

649. Because of JPMS's breach of its express warranty, Illinois Plaintiffs and the Illinois Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. 810 Ill. Comp. Stat. 5/2-714.

**COUNT II**
**ILLINOIS DECEPTIVE TRADE PRACTICES ACT**
**("Illinois DTPA")**

650. Illinois Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

651. JPMS, Illinois Plaintiffs, and the Illinois Class are all "persons" under 815 Ill. Comp. Stat. 505/1 and 815 Ill. Comp. Stat. 510/1.

652. Illinois Plaintiffs and the Illinois Class are all "consumers" under 815 Ill. Comp. Stat. 505/1.

653. JPMS is engaged in "trade" or "commerce" under 815 Ill. Comp. Stat. 505/1.

654. The Illinois DPA makes "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce . . . unlawful whether any person has in fact been misled, deceived or damaged." 815 Ill. Comp. Stat. 505/2.

655. Unfair trade practices under the Illinois DTPA, include:

a. Causing "likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services;"

b. Representing "that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that he or she does not have;"

c. Representing "that goods or services are of a particular standard, quality, or grade or that goods are a particular style or model, if they are of another;" and

d. Engaging "in any other conduct which similarly creates a likelihood of confusion or misunderstanding." 815 Ill. Comp. Stat. 510/2(a).

656. JPMS engaged in unfair or deceptive acts or practices that violated the Illinois DTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

657. JPMS's actions occurred in the sale of goods to Illinois Plaintiffs and the Illinois Class.

658. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

659. In purchasing JPMS products, Illinois Plaintiffs and the Illinois Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

660. Had Illinois Plaintiffs and the other Illinois Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

661. Illinois Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

662. Under 815 Ill. Comp. Stat. 505/10a, Illinois Plaintiffs, individually and on behalf of the other Illinois Class members, seek actual damages against JPMS for the harm caused by JPMS's violations of the Illinois DTPA as alleged herein.

663. Illinois Plaintiffs, individually and on behalf of the other Illinois Class members, seek punitive damages against Defendant under 815 Ill. Comp. Stat. 505/10a because JPMS recklessly disregarded the rights of Illinois Plaintiffs and the Illinois Class. JPMS intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free.

664. Illinois Plaintiffs, individually and on behalf of the other Illinois Class members, seek costs of court, attorneys' fees under 815 Ill. Comp. Stat. 505/10a and 815 Ill. Comp. Stat. 510/3, and any other just and proper relief available under the Illinois DTPA.

### I. Indiana Causes of Action Alleged by Plaintiff Kathryn Kessinger ("Indiana Plaintiff")

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE INDIANA UNIFORM COMMERCIAL CODE**

665. Indiana Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

666. JPMS sells hair-care products, which qualify as goods under the Indiana Uniform Commercial Code. Ind. Code § 26-1-2-105.

667. Indiana Plaintiff and the Indiana Class purchased various JPMS hair-care products during the applicable Class period.

668. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Ind. Code § 26-1-2-313.

669. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. Ind. Code § 26-1-2-313.

670. JPMS's representations were part of the basis of the bargain with Indiana Plaintiff and the Indiana Class.

671. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

672. Indiana Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Indiana Plaintiff discovered the breach. Ind. Code § 26-1-2-607.

673. Because of JPMS's breach of its express warranty, Indiana Plaintiff and the Indiana Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Ind. Code § 26-1-2-714.

**COUNT II**
**INDIANA DECEPTIVE CONSUMER SALES ACT**
**("Indiana DCSA")**

674. Indiana Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

675. JPMS, Indiana Plaintiff, and the Indiana Class are all "persons" under Ind. Code § 24-5-0.5-2(a)(2).

676. Indiana Plaintiff and the Indiana Class engaged in a "consumer transaction" with JPMS under Ind. Code § 24-5-0.5-2(a)(1).

677. JPMS is a "supplier" under Ind. Code § 24-5-0.5-2(a)(3).

678. JPMS hair-care products are the "subject of a consumer transaction" under Ind. Code § 24-5-0.5-2(a)(4).

679. The Indiana DCSA makes it unlawful for a "supplier" to "commit an unfair, abusive, or deceptive act, omission, or practice in connection with a consumer transaction . . . [which] includes both implicit and explicit misrepresentations." Ind. Code § 24-5-0.5-3(a).

680. Deceptive acts under Indiana Code § 24-5-0.5-3(b), include:

a. "That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits it does not have which the supplier knows or should reasonably know it does not have"; and

b. "That such subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if it is not and if the supplier knows or should reasonably know that it is not."

681. JPMS engaged in unfair or deceptive acts or practices that violated the Indiana DCSA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal

testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

682. JPMS's actions occurred in the sale of goods to Indiana Plaintiff and the Indiana Class.

683. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

684. In purchasing JPMS products, Indiana Plaintiff and the Indiana Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

685. Had Indiana Plaintiff and the other Indiana Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

686. Indiana Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

687. Under Ind. Code § 24-5-0.5-4(a), Indiana Plaintiff, individually and on behalf of the other Indiana Class members, seeks the greater of actual damages or $500 against JPMS for the harm caused by JPMS's violations of the Indiana DCSA as alleged herein.

688. Indiana Plaintiff, individually and on behalf of the other Indiana Class members, seek the greater of treble actual damages or $1,000 against JPMS under Ind. Code § 24-5-0.5-4(a) because it willfully deceived Indiana Plaintiff and the Indiana Class. JPMS intentionally and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free.

689. Indiana Plaintiff, individually and on behalf of the other Indiana Class members, seeks costs of court, attorneys' fees under Ind. Code § 24-5-0.5-4(b), and any other just and proper relief available under the Indiana DCSA.

690. Indiana Plaintiff, for herself and as representative of the Indiana Class, sent a notice and demand over thirty days before bringing suit, as specified by Indiana Code § 24-5-0.5-5.

**J. Massachusetts Causes of Action Alleged by Plaintiffs Kelly Dugas, Leila Mello, and Kimberly Weatherbee ("Massachusetts Plaintiffs")**

**COUNT I**
**MASSACHUSETTS CONSUMER PROTECTION ACT**
**("Massachusetts CPA")**

691. Massachusetts Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

692. JPMS, Massachusetts Plaintiffs, and the Massachusetts Class are all "persons" under Massachusetts General Laws ch. 93A, § 1(a).

693. JPMS is engaged in "trade" and "commerce" under Massachusetts General Laws ch. 93A, § 1(b).

694. Under the Massachusetts CPA "Unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Mass. Gen. Laws ch. 93A, § 2.

695. JPMS engaged in unfair or deceptive acts or practices that violated the Massachusetts CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

696. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

697. In purchasing JPMS products, Massachusetts Plaintiffs and the Massachusetts Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

698. Had Massachusetts Plaintiffs and the other Massachusetts Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

699. Massachusetts Plaintiffs suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

700. Massachusetts Plaintiffs, individually and on behalf of the other Massachusetts Class members, seek the greater of actual damages or $25 for the harm caused by JPMS's violations of the Massachusetts CPA as alleged herein. Mass. Gen. Laws ch. 93A, § 9.

701. Massachusetts Plaintiffs, individually and on behalf of the other Massachusetts Class members, seek treble damages against JPMS under the Massachusetts CPA because JPMS's conduct was willful and knowing as alleged herein. JPMS knowingly and willfully misrepresented material facts that only it knew, specifically that it performed no animal testing and its products were cruelty free. Mass. Gen. Laws ch. 93A, § 9.

702. Massachusetts Plaintiffs, individually and on behalf of the other Massachusetts Class members, seek costs of court, attorneys' fees under Mass. Gen. Laws ch. 93A, § 9, and any other just and proper relief available under the Massachusetts CPA.

703. Massachusetts Plaintiffs, for themselves and as representatives of the Massachusetts Class, sent a notice and demand over thirty days before bringing suit, as specified by Mass. Gen. Laws ch. 93A, § 9.

**K. Michigan Causes of Action Alleged by Plaintiff Lauren Carr ("Michigan Plaintiff")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE MICHIGAN UNIFORM COMMERCIAL CODE**

704. Michigan Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

705. JPMS sells hair-care products, which qualify as goods under the Uniform Commercial Code. Mich. Comp. Laws § 440.2105.

706. Michigan Plaintiff and the Michigan Class purchased various JPMS hair-care products during the applicable Class period.

707. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Mich. Comp. Laws § 440.2313.

708. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company.

709. JPMS's representations were part of the basis of the bargain with Michigan Plaintiff and the Michigan Class.

710. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

711. Michigan Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Michigan Plaintiff discovered the breach. Mich. Comp. Laws § 440.2607.

712. Because of JPMS's breach of its express warranty, Michigan Plaintiff and the Michigan Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Mich. Comp. Laws § 440.2714.

**COUNT II**
**MICHIGAN CONSUMER PROTECTION ACT ("Michigan CPA")**

713. Michigan Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

714. JPMS, Michigan Plaintiff, and the Michigan Class are all "persons" under Michigan Compiled Laws § 445.902.

715. JPMS is conducting "trade or commerce" under Michigan Compiled Laws § 445.902.

716. The Michigan CPA makes it unlawful to engage in "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce," including:

a. "Causing a probability of confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has sponsorship, approval, status, affiliation, or connection that he or she does not have"; and

c. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Mich. Comp. Laws § 445.903.

717. JPMS engaged in unfair or deceptive acts or practices that violated the Michigan CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

718. JPMS's actions occurred in the sale of goods to Michigan Plaintiff and the Michigan Class.

719. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

720. In purchasing JPMS products, Michigan Plaintiff and the Michigan Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

721. Had Michigan Plaintiff and the other Michigan Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

722. Michigan Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

723. Michigan Plaintiff, individually and on behalf of the other Michigan Class members, seeks actual damages against JPMS for the harm caused by JPMS's violations of the Michigan CPA as alleged herein. Mich. Comp. Laws § 445.911.

724. Michigan Plaintiff, individually and on behalf of the other Michigan Class members, seeks costs and attorneys' fees, and any other such appropriate relief available under the Michigan CPA. Mich. Comp. Laws § 445.911.

**L. Minnesota Causes of Action Alleged by Plaintiff Kim Davis ("Minnesota Plaintiff")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE MINNESOTA UNIFORM COMMERCIAL CODE**

725. Minnesota Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

726. JPMS sells hair-care products, which qualify as goods under the Minnesota Uniform Commercial Code. Minn. Stat. § 336.2-105.

727. Minnesota Plaintiff and the Minnesota Class purchased various JPMS hair-care products during the applicable Class period.

728. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Minn. Stat. § 336.2-313.

729. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

730. JPMS's representations were part of the basis of the bargain with Minnesota Plaintiff and the Minnesota Class.

731. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

732. Minnesota Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Minnesota Plaintiff discovered the breach. Minn. Stat. § 336.2-607.

733. Because of JPMS's breach of its express warranty, Minnesota Plaintiff and the Minnesota Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Minn. Stat. § 336.2-714.

**COUNT II**
**MINNESOTA UNLAWFUL TRADE PRACTICES ACT**
**("Minnesota UTPA")**

734. Minnesota Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

735. JPMS, Minnesota Plaintiff, and the Minnesota Class are all "persons" under Minnesota Statute § 325D.10(a).

736. Any purchase of a JPMS hair-care product constitutes a "sale" and JPMS is "sell[ing]" products under Minn. Stat. § 325D.10.

737. The Minnesota UTPA provides that "the trade practices defined and prohibited by sections 325D.09 to 325D.16 . . . mislead consumers as to the quality, ingredients and origin of merchandise purchased . . . and that they constitute unfair and fraudulent competition and unsound and uneconomic methods of distribution." Minn. Stat. § 325D.09.

738. Minnesota Statute §325D.13 provides: "No person shall, in connection with the sale of merchandise, knowingly misrepresent, directly or indirectly, the true quality, ingredients or origin of such merchandise."

739. JPMS engaged in unlawful practices that violated the Minnesota UTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

740. JPMS's actions occurred in the sale of goods to Minnesota Plaintiff and the Minnesota Class.

741. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

742. In purchasing JPMS products, Minnesota Plaintiff and the Minnesota Class relied on the misrepresentations of JPMS regarding its stance against animal

testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

743. Had Minnesota Plaintiff and the other Minnesota Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

744. Minnesota Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

745. Minnesota Plaintiff, individually and on behalf of the other Minnesota Class members, seeks actual damages against JPMS for the harm caused by JPMS's violations of the Minnesota UTPA as alleged herein. Minn. Stat. § 325D.15.

## M. Nevada Causes of Action Alleged by Plaintiffs Hannah Howell and Susan Veach ("Nevada Plaintiffs")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE NEVADA UNIFORM COMMERCIAL CODE

746. Nevada Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

747. JPMS sells hair-care products, which qualify as goods under the Uniform Commercial Code. Nev. Rev. Stat. § 104.2105.

748. Nevada Plaintiffs and the Nevada Class purchased various JPMS hair-care products during the applicable class period.

749. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Nev. Rev. Stat. § 104.2313.

750. JPMS's representations were part of the basis of the bargain with Nevada Plaintiffs and the Nevada Class.

751. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

752. Nevada Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Nevada Plaintiffs discovered the breach. Nev. Rev. Stat. § 104.2607.

753. Because of JPMS's breach of its express warranty, Nevada Plaintiffs and the Nevada Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Nev. Rev. Stat. § 104.2714.

**COUNT II**
**NEVADA DECEPTIVE TRADE PRACTICES ACT**
**("Nevada DTPA")**

754. Nevada Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

755. Under Nevada Revised Statute § 598.0915, "[a] person engages in a 'deceptive trade practice' if, in the course of his or her business or occupation, he or she":

a. "Knowingly makes a false representation as to the source, sponsorship, approval or certification of goods or services for sale or lease";

b. "Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; and

c. "Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model."

756. JPMS engaged in unfair or deceptive acts or practices that violated the Nevada DTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

757. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

758. In purchasing JPMS products, Nevada Plaintiffs and the Nevada Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

759. Had Nevada Plaintiffs and the other Nevada Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

760. Nevada Plaintiffs and the Nevada Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

761. Nevada Plaintiffs, individually and on behalf of the other Nevada Class members, seek actual damages, costs of court, attorneys' fees, and any other just and proper relief available under the Nevada DTPA. Nevada Revised Statute § 41.600.

### N. New Hampshire Causes of Action Alleged by Plaintiff Kimberly Weatherbee ("New Hampshire Plaintiff")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE NEW HAMPSHIRE UNIFORM COMMERCIAL CODE

762. New Hampshire Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

763. JPMS sells hair-care products, which qualify as goods under the New Hampshire Uniform Commercial Code. N.H. Rev. Stat. § 382-A:2-105.

764. New Hampshire Plaintiff and the New Hampshire Class purchased various JPMS hair-care products during the applicable Class period.

765. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. N.H. Rev. Stat. § 382-A:2-313.

766. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

767. JPMS's representations were part of the basis of the bargain with New Hampshire Plaintiff and the New Hampshire Class.

768. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

769. New Hampshire Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after New Hampshire Plaintiff discovered the breach. N.H. Rev. Stat. § 382-A:2-607.

770. Because of JPMS's breach of its express warranty, New Hampshire Plaintiff and the New Hampshire Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. N.H. Rev. Stat. § 382-A:2-714.

**COUNT II**
**NEW HAMPSHIRE CONSUMER PROTECTION ACT**
**("New Hampshire CPA")**

771. New Hampshire Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

772. JPMS, New Hampshire Plaintiff, and the New Hampshire Class are all "persons" under N.H. Rev. Stat. § 358-A:1(I).

773. JPMS is engaged in "trade" or "commerce" under N.H. Rev. Stat. § 358-A:1(II).

774. JPMS hair-care products are "trade" and "commerce" under N.H. Rev. Stat. § 358-A:1.

775. The New Hampshire CPA makes it "unlawful for any person to use any unfair method of competition or any unfair or deceptive act or practice in the conduct of any trade or commerce within this state." N.H. Rev. Stat. § 358-A:2.

776. Deceptive acts under the New Hampshire CPA include:

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "Causing likelihood of confusion or of misunderstanding as to affiliation, connection or association with, or certification by, another"; and

c. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." N.H. Rev. Stat. § 358-A:2.

777. JPMS engaged in unfair or deceptive acts or practices that violated the New Hampshire CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

778. JPMS's actions occurred in the sale of goods to New Hampshire Plaintiff and the New Hampshire Class.

779. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

780. In purchasing JPMS products, New Hampshire Plaintiff and the New Hampshire Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

781. Had New Hampshire Plaintiff and the other New Hampshire Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

782. New Hampshire Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

783. New Hampshire Plaintiff, individually and on behalf of the other New Hampshire Class members, seeks the greater of actual damages or $1,000 for the harm caused by JPMS's violations of the New Hampshire CPA as alleged herein. N.H. Rev. Stat. §§ 358-A:10, 358-A:10-a.

784. New Hampshire Plaintiff, individually and on behalf of the other New Hampshire Class members, seeks between double and treble damages under the New Hampshire CPA, because JPMS knowingly and willfully misrepresented material

facts that only it knew, specifically that it performed no animal testing and its products were cruelty free. N.H. Rev. Stat. Ann§§ 358-A:10, 358-A:10-a.

785. New Hampshire Plaintiff, individually and on behalf of the other New Hampshire Class members, seeks costs of court and attorneys' fees under New Hampshire Revised Statute §§ 358-A:10, 358-A:10-a, and any other just and proper relief available under the New Hampshire CPA.

**O. New Jersey Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("New Jersey Plaintiff")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE NEW JERSEY UNIFORM COMMERCIAL CODE**

786. New Jersey Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

787. JPMS sells hair-care products, which qualify as goods under the New Jersey Uniform Commercial Code. N.J. Rev. Stat. § 12A:2-105.

788. New Jersey Plaintiff and the New Jersey Class purchased various JPMS hair-care products during the applicable Class period.

789. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. N.J. Rev. Stat. § 12A:2-313.

790. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

791. JPMS's representations were part of the basis of the bargain with New Jersey Plaintiff and the New Jersey Class.

792. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

793. New Jersey Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after New Jersey Plaintiff discovered the breach. N.J. Rev. Stat. § 12A:2-607.

794. Because of JPMS's breach of its express warranty, New Jersey Plaintiff and the New Jersey Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. N.J. Rev. Stat. § 12A:2-714.

**COUNT II**
**NEW JERSEY UNFAIR TRADE PRACTICES ACT**
**("New Jersey UTPA")**

795. New Jersey Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

796. JPMS, New Jersey Plaintiff, and the New Jersey Class are all "persons" under N.J. Rev. Stat. § 56:8-1(d).

797. JPMS hair-care products are "merchandise" under Rev. N.J. Stat. § 56:8-1(c).

798. JPMS is engaged in the "advertisement" and "sale" of merchandise under N.J. Rev. Stat. § 56:8-1(a), (e).

799. The New Jersey UTPA provides: "The act, use or employment by any person of any commercial practice that is unconscionable or abusive, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression, or omission of any material fact with intent that others rely upon such

concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." N.J. Rev. Stat. § 56:8-2.

800. JPMS engaged in unfair or deceptive acts or practices that violated the New Jersey UTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

801. JPMS's actions occurred in the advertising and sale of merchandise to New Jersey Plaintiff and the New Jersey Class.

802. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

803. In purchasing JPMS products, New Jersey Plaintiff and the New Jersey Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

804. Had New Jersey Plaintiff and the other New Jersey Class members known they would not receive products that had never been animal tested or that

they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

805. New Jersey Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

806. Under the New Jersey UTPA, New Jersey Plaintiff, individually and on behalf of the other New Jersey Class members, seeks a refund of all monies that JPMS acquired through its unlawful practices as alleged herein. N.J. Rev. Stat. §§ 56:8-2.11, 56:8-2.12.

807. New Jersey Plaintiff, individually and on behalf of the other New Jersey Class members, seek treble damages, seek costs of court, and attorneys' fees under N.J. Rev. Stat. § 56:8-19, and any other just and proper relief available under the New Jersey UTPA.

## P. North Carolina Causes of Action Alleged by Plaintiff Kristy Creech ("North Carolina Plaintiff")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE NORTH CAROLINA UNIFORM COMMERCIAL CODE

808. North Carolina Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

809. JPMS sells hair-care products, which qualify as goods under the North Carolina Uniform Commercial Code. N.C. Gen. Stat. § 25-2-105.

810. North Carolina Plaintiff and the North Carolina Class purchased various JPMS hair-care products during the applicable Class period.

811. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. N.C. Gen. Stat. § 25-2-313.

812. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. N.C. Gen. Stat. § 25-2-313.

813. JPMS's representations were part of the basis of the bargain with North Carolina Plaintiff and the North Carolina Class.

814. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

815. North Carolina Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after North Carolina Plaintiff discovered the breach. N.C. Gen. Stat. § 25-2-607.

816. Because of JPMS's breach of its express warranty, North Carolina Plaintiff and the North Carolina Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. N.C. Gen. Stat. § 25-2-714.

**COUNT II**
**NORTH CAROLINA UNFAIR AND DECEPTIVE PRACTICES ACT**
**("North Carolina UDPA")**

817. North Carolina Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

818. JPMS is engaged in "commerce" under N.C. Gen. Stat. § 75-1.1.

819. The North Carolina UDPA makes "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce . . . unlawful." N.C. Gen. Stat. § 75-1.1(a).

820. JPMS engaged in unfair or deceptive acts or practices that violated the North Carolina UDPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

821. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

822. In purchasing JPMS products, North Carolina Plaintiff and the North Carolina Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

823. Had North Carolina Plaintiff and the other North Carolina Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

824. North Carolina Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

825. North Carolina Plaintiff, individually and on behalf of the other North Carolina Class members, seeks treble actual damages for the harm caused by JPMS's violations of the North Carolina UDPA as alleged herein. N.C. Gen. Stat. § 75-16.

826. North Carolina Plaintiff, individually and on behalf of the other North Carolina Class members, seeks the costs of court and attorneys' fees under N.C. Gen. Stat. § 75-16.1, because JPMS's conduct was willful or there has been an unwarranted refusal to resolve the matter.

## Q. Ohio Causes of Action Alleged by Plaintiff Gayanna Lynne Rule ("Ohio Plaintiff")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE OHIO UNIFORM COMMERCIAL CODE

827. Ohio Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

828. JPMS sells hair-care products, which qualify as goods under the Ohio Uniform Commercial Code Ohio Rev. Code § 1302.01.

829. Ohio Plaintiff and the Ohio Class purchased various JPMS hair-care products during the applicable Class period.

830. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Ohio Rev. Code § 1302.26.

831. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and it was a cruelty-free company. *Id.*

832. JPMS's representations were part of the basis of the bargain with Ohio Plaintiff and the Ohio Class.

833. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

834. Ohio Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Ohio Plaintiff discovered the breach. Ohio Rev. Code § 1302.65.

835. Because of JPMS's breach of its express warranty, Ohio Plaintiff and the Ohio Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Ohio Rev. Code § 1302.88.

**COUNT II**
**OHIO CONSUMER SALES PRACTICES ACT ("Ohio CSPA")**

836. Ohio Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

837. Ohio Plaintiff and the Ohio Class members are all "consumers" under Ohio Rev. Code § 1345.01(D).

838. JPMS is a "supplier" under Ohio Rev. Code § 1345.01(C).

839. Ohio Plaintiff and the Ohio Class members entered into a "consumer transaction" with JPMS when they purchased JPMS hair-care products. Ohio Rev. Code § 1345.01(A).

840. The Ohio CSPA provides that "[n]o supplier shall commit an unfair or deceptive act or practice in connection with a consumer transaction. Such an unfair or deceptive act or practice by a supplier violates this section whether it occurs before, during, or after the transaction." Ohio Rev. Code § 1345.02(A).

841. Deceptive acts under the Ohio CSPA include:

a. "That the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits that it does not have";

b. "That the subject of a consumer transaction is of a particular standard, quality, grade, style, prescription, or model, if it is not"; and

c. "That the supplier has a sponsorship, approval, or affiliation that the supplier does not have." Ohio Rev. Code § 1345.02(B).

842. JPMS engaged in unfair or deceptive acts or practices that violated the Ohio CSPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

843. JPMS's actions occurred in the sale of goods to Ohio Plaintiff and the Ohio Class.

844. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals

and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

845. In purchasing JPMS products, Ohio Plaintiff and the Ohio Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

846. Had Ohio Plaintiff and the other Ohio Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

847. Ohio Plaintiff suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

848. Ohio Plaintiff, individually and on behalf of the other Ohio Class members, seeks actual damages for the harm caused by JPMS's violations of the Ohio CSPA as alleged herein. Ohio Rev. Code § 1345.09.

849. Ohio Plaintiff, individually and on behalf of the other Ohio Class members, seeks attorneys' fees under Ohio Rev. Code § 1345.09, as JPMS knowingly violated the Ohio CSPA, and any other just and proper relief available under the Ohio CSPA.

## R. Oklahoma Causes of Action Alleged by Plaintiff Terasa Rowe ("Oklahoma Plaintiff")

### COUNT I
### OKLAHOMA CONSUMER PROTECTION ACT ("Oklahoma CPA")

850. Oklahoma Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

851. JPMS, Oklahoma Plaintiff, and the Oklahoma Class members are all "persons" under Okla. Stat. tit. 15, § 752.

852. Oklahoma Plaintiff and the Oklahoma Class entered into a "consumer transaction" with JPMS under Okla. Stat. tit. 15, § 752.

853. Under the Oklahoma CPA, a "person engages in a practice which is declared to be unlawful under the Oklahoma Consumer Protection Act when, in the course of the persons business, the person":

a. "Makes a false or misleading representation, knowingly or with reason to know, as to the source, sponsorship, approval, or certification of the subject of a consumer transaction";

b. "Makes a false representation, knowingly or with reason to know, as to the characteristics, ingredients, uses, benefits, alterations, or quantities of the subject of a consumer transaction or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; and

c. "Represents, knowingly or with reason to know, that the subject of a consumer transaction is of a particular standard, style or model, if it is of another." Okla. Stat. tit. 15, § 753.

854. JPMS engaged in unfair or deceptive acts or practices that violated the Oklahoma CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

855. JPMS's actions occurred in a consumer transaction to Oklahoma Plaintiff and the Oklahoma Class.

856. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

857. In purchasing JPMS products, Oklahoma Plaintiff and the Oklahoma Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

858. Had Oklahoma Plaintiff and the other Oklahoma Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

859. Oklahoma Plaintiff and the Oklahoma Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

860. Oklahoma Plaintiff, individually and on behalf of the other Oklahoma Class members, seeks actual damages, costs, and attorneys' fees under Okla. Stat. tit. 15, § 761.1, and any other just and proper relief available under the Oklahoma CPA.

**S. Oregon Causes of Action Alleged by Plaintiffs Hannah Howell and Anthony Francesconi ("Oregon Plaintiffs")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE OREGON UNIFORM COMMERCIAL CODE**

861. Oregon Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

862. JPMS sells hair-care products, which qualify as goods under the Oregon Uniform Commercial Code. Or. Rev. Stat. § 72.1050.

863. Oregon Plaintiffs and the Oregon Class purchased various JPMS hair-care products during the applicable Class period.

864. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Or. Rev. Stat. § 72.3130.

865. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

866. JPMS's representations were part of the basis of the bargain with Oregon Plaintiffs and the Oregon Class.

867. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

868. Oregon Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Oregon Plaintiffs discovered the breach. Or. Rev. Stat. § 72.6070.

869. Because of JPMS's breach of its express warranty, Oregon Plaintiffs and the Oregon Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Or. Rev. Stat. § 72.7140.

**COUNT II**
**OREGON UNLAWFUL TRADE PRACTICES ACT**
**("Oregon UTPA")**

870. Oregon Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

871. JPMS, Oregon Plaintiffs, and the Oregon Class members are all "persons" under Or. Rev. Stat. § 646.605.

872. JPMS hair-care products are "goods" under Or. Rev. Stat. § 646.605.

873. Under the Oregon UTPA, "[a] person engages in an unlawful practice if in the course of the person's business, vocation or occupation the person does any of the following":

a. "Causes likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of real estate, goods or services";

b. "Represents that real estate, goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, quantities or qualities that the real estate, goods or services do not have or that a person has a sponsorship, approval, status, qualification, affiliation, or connection that the person does not have";

c. "Represents that real estate, goods or services are of a particular standard, quality, or grade, or that real estate or goods are of a particular style or model, if the real estate, goods or services are of another." Or. Rev. Stat. § 646.608.

874. JPMS engaged in unfair or deceptive acts or practices that violated the Oregon UTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

875. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

876. In purchasing JPMS products, Oregon Plaintiffs and the Oregon Class relied on the misrepresentations of JPMS regarding its stance against animal testing

and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

877. Had Oregon Plaintiffs and the other Oregon Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

878. Oregon Plaintiffs and the Oregon Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

879. Oregon Plaintiffs, individually and on behalf of the other Oregon Class members, seek the greater of actual damages or $200 for the harm caused by JPMS's violations of the Oregon UTPA as alleged herein, because JPMS's conduct was reckless or knowing. Oregon Rev. Stat. § 646.638.

880. Oregon Plaintiffs, individually and on behalf of the other Oregon Class members, seek punitive damages under Oregon Revised Statute § 646.638.

881. Oregon Plaintiffs, individually and on behalf of the other Oregon Class members, seek costs and attorneys' fees under Oregon Revised Statute § 646.638, and any other just and proper relief available under the Oregon UTPA.

## T. Pennsylvania Causes of Action Alleged by Plaintiffs Hollie Shadd and Ashley Price-Horton ("Pennsylvania Plaintiffs")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE PENNSYLVANIA UNIFORM COMMERCIAL CODE

882. Pennsylvania Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

883. JPMS sells hair-care products, which qualify as goods under the Pennsylvania Uniform Commercial Code. 13 Pa. Stat. and Cons. Stat. § 2105.

884. Pennsylvania Plaintiffs and the Pennsylvania Class purchased various JPMS hair-care products during the applicable Class period.

885. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. 13 Pa. Stat. and Cons. Stat. § 2313.

886. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

887. JPMS's representations were part of the basis of the bargain with Pennsylvania Plaintiffs and the Pennsylvania Class.

888. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

889. Pennsylvania Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Pennsylvania Plaintiffs discovered the breach. 13 Pa. Stat. and Cons. Stat. § 2607.

890. Because of JPMS's breach of its express warranty, Pennsylvania Plaintiffs and the Pennsylvania Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. 13 Pa. Stat. and Cons. Stat. § 2714.

**COUNT II**
**PENNSYLVANIA UNFAIR TRADE PRACTICES AND CONSUMER PROTECTION LAW ("Pennsylvania UTPCPL")**

891. Pennsylvania Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

892. JPMS, Pennsylvania Plaintiffs, and the Pennsylvania Class members are all "persons" under 73 Pa. Stat. § 201-2(11).

893. JPMS hair-care products are "goods" under 73 Pa. Stat. § 201-2.

894. JPMS is engaged in "trade" and "commerce" under 73 Pa. Stat. § 201-2(3).

895. Under the Pennsylvania UTPCPL, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce" are unlawful. 73 Pa. Stat. § 201-3.

896. "'Unfair methods of competition' and 'unfair or deceptive acts or practices' mean any one or more of the following":

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services";
b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation or connection that he does not have";
c. "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." 73 Pa. Stat. § 201-2.

897. JPMS engaged in unfair or deceptive acts or practices that violated the Pennsylvania UTPCPL, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

898. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

899. In purchasing JPMS products, Pennsylvania Plaintiffs and the Pennsylvania Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

900. Had Pennsylvania Plaintiffs and the other Pennsylvania Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

901. Pennsylvania Plaintiffs and the Pennsylvania Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

902. Under 73 Pa. Stat. Ann. § 201-9.2, Pennsylvania Plaintiffs, individually and on behalf of the other Pennsylvania Class members, seek the greater of actual damages or $100 for the harm caused by JPMS's violations of the Pennsylvania UTPCPL as alleged herein. 73 Pa. Stat. § 201-9.2.

903. Pennsylvania Plaintiffs, individually and on behalf of the other Pennsylvania Class members, seek treble damages under 73 Pa. Stat. § 201-9.2.

904. Pennsylvania Plaintiffs, individually and on behalf of the other Pennsylvania Class members, seek costs and attorneys' fees under 73 Pa. Stat. § 201-9.2, and any other just and proper relief available under the Pennsylvania UTPCPL.

## U. Rhode Island Causes of Action Alleged by Plaintiff Kimberly Weatherbee ("Rhode Island Plaintiff")

### COUNT I
### RHODE ISLAND DECEPTIVE TRADE PRACTICES ACT
### ("Rhode Island DTPA")

905. Rhode Island Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

906. JPMS, Rhode Island Plaintiff, and the Rhode Island Class members are all "persons" under 6 R.I. Gen. Laws § 6-13.1-1.

907. JPMS is engaged in "trade" and "commerce" under 6 R.I. Gen. Laws § 6-13.1-1.

908. Under the Rhode Island DTPA, "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce are declared unlawful." 6 R.I. Gen. Laws § 6-13.1-2.

909. "Unfair methods of competition and unfair or deceptive acts or practices" means any one or more of the following":

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have";

c. "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." 6 R.I. Gen. Laws § 6-13.1-1.

910. JPMS engaged in unfair or deceptive acts or practices that violated the Rhode Island DTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

911. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

912. In purchasing JPMS products, Rhode Island Plaintiff and the Rhode Island Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's

representations turned out not to be true because it tested on animals to sell its products in China.

913. Had Rhode Island Plaintiff and the other Rhode Island Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

914. Rhode Island Plaintiff and the Rhode Island Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

915. Rhode Island Plaintiff, individually and on behalf of the other Rhode Island Class members, seeks the greater of actual damages or $500 for the harm caused by JPMS's violations of the Rhode Island DTPA as alleged herein. 6 R.I. Gen. Laws § 6-13.1-5.2.

916. Rhode Island Plaintiff, individually and on behalf of the other Rhode Island Class members, seeks treble damages under 6 R.I. Gen. Laws § 6-13.1-5.2.

917. Rhode Island Plaintiff, individually and on behalf of the other Rhode Island Class members, seeks costs and attorneys' fees under 6 R.I. Gen. Laws § 6-13.1-5.2, and any other just and proper relief available under the Rhode Island DTPA.

## V. South Carolina Causes of Action Alleged by Plaintiff Kimbrelle Rodgers ("South Carolina Plaintiff")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE SOUTH CAROLINA UNIFORM COMMERCIAL CODE

918. South Carolina Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

919. JPMS sells hair-care products, which qualify as goods under the South Carolina Uniform Commercial Code. S.C. Code § 36-2-105.

920. South Carolina Plaintiff and the South Carolina Class purchased various JPMS hair-care products during the applicable Class period.

921. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. S.C. Code § 36-2-313.

922. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

923. JPMS's representations were part of the basis of the bargain with South Carolina Plaintiff and the South Carolina Class.

924. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

925. South Carolina Plaintiff notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after South Carolina Plaintiff discovered the breach. S.C. Code § 36-2-607.

926. Because of JPMS's breach of its express warranty, South Carolina Plaintiff and the South Carolina Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. S.C. Code § 36-2-714.

**W. Tennessee Causes of Action Alleged by Plaintiffs Katelyn Dias and Deanna Harrell ("Tennessee Plaintiffs")**

**COUNT I**
**TENNESSEE CONSUMER PROTECTION ACT**
**("Tennessee CPA")**

927. Tennessee Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

928. JPMS, Tennessee Plaintiffs, and the Tennessee Class members are all "persons" under Tenn. Code § 47-18-103.

929. JPMS hair-care products are "goods" under Tenn. Code § 47-18-103.

930. JPMS is engaged in "trade" and "commerce" under Tenn. Code § 47-18-103.

931. Under the Tennessee CPA, "[t]he following unfair or deceptive acts or practices affecting the conduct of any trade or commerce are declared to be unlawful":

a. "Causing likelihood of confusion or of misunderstanding as to the source, sponsorship, approval or certification of goods or services";

b. "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits or quantities that they do not

have or that a person has a sponsorship approval, status, affiliation or connection that such person does not have";

c. "Representing that goods or services are of a particular standard, quality or grade, or that goods are of a particular style or model, if they are of another." Tenn. Code § 47-18-104.

932. JPMS engaged in unfair or deceptive acts or practices that violated the Tennessee CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

933. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

934. In purchasing JPMS products, Tennessee Plaintiffs and the Tennessee Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

935. Had Tennessee Plaintiffs and the other Tennessee Class members known they would not receive products that had never been animal tested or that

they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

936. Tennessee Plaintiffs and the Tennessee Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

937. Tennessee Plaintiffs, individually and on behalf of the other Tennessee Class members, seek actual damages for the harm caused by JPMS's violations of the Tennessee CPA as alleged herein. Tenn. Code § 47-18-109.

938. Tennessee Plaintiffs, individually and on behalf of the other Tennessee Class members, seek treble damages under Tenn. Code § 47-18-109.

939. Tennessee Plaintiffs, individually and on behalf of the other Tennessee Class members, seek costs and attorneys' fees under Tenn. Code § 47-18-109, and any other just and proper relief available under the Tennessee CPA.

**COUNT II**
**UNJUST ENRICHMENT (IN THE ALTERNATIVE)**

940. Tennessee Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

941. In purchasing JPMS hair-care products, Tennessee Plaintiffs conferred a benefit on JPMS.

942. JPMS's retention of that benefit was unjust because Tennessee Plaintiffs and the Tennessee Class would not have purchased or would not have paid as much for the JPMS hair-care products had they known that the cruelty-free and no animal testing representations were false.

943. JPMS's acceptance of the benefit is inequitable because Tennessee Plaintiffs and the Tennessee Class would not have purchased or would not have paid as much for the JPMS hair-care products had they known that the cruelty-free and no animal testing representations were false.

944. Tennessee Plaintiffs are not in privity with JPMS, because they purchased their products from third-party retailers, making any exhaustion of remedies futile.

945. Tennessee Plaintiffs and the Tennessee Class have no adequate remedy at law.

946. Tennessee Plaintiffs, individually and on behalf of the Tennessee Class, seek damages equal to the improper benefit conferred on JPMS, in an amount to be proven at trial.

## X. Texas Causes of Action Alleged by Plaintiffs Hannah Howell, Gayanna Lynne Rule, and Mark Geis ("Texas Plaintiffs")

### COUNT I
### TEXAS DECEPTIVE TRADE PRACTICES-CONSUMER PROTECTION ACT ("Texas DTPA")

947. Texas Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

948. JPMS, Texas Plaintiffs, and the Texas Class members are all "persons" under Tex. Bus. & Com. Code § 17.45.

949. Texas Plaintiffs and the Texas Class members are "consumers" under Tex. Bus. & Com. Code § 17.45.

950. JPMS hair-care products are "goods" under Tex. Bus. & Com. Code § 17.45.

951. JPMS is engaged in "trade" and "commerce" under Tex. Bus. & Com. Code § 17.45.

952. Under the Texas DTPA, "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce are hereby declared unlawful." Tex. Bus. & Com. Code § 17.46.

953. Under the Texas DTPA "'false, misleading, or deceptive acts or practices' includes, but is not limited to, the following acts":

a. "causing confusion or misunderstanding as to the source, sponsorship, approval, or certification of goods or services";

b. "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities which they do not have or that a person has a sponsorship, approval, status, affiliation, or connection which the person does not";

c. "representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another." Tex. Bus. & Com. Code § 17.46.

954. JPMS engaged in unfair or deceptive acts or practices that violated the Texas DTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

955. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

956. In purchasing JPMS products, Texas Plaintiffs and the Texas Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

957. Had Texas Plaintiffs and the other Texas Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

958. Texas Plaintiffs and the Texas Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

959. Texas Plaintiffs, individually and on behalf of the other Texas Class members, seek actual damages for the harm caused by JPMS's violations of the Texas DTPA as alleged herein. Tex. Bus. & Com. Code § 17.50.

960. Texas Plaintiffs, individually and on behalf of the other Texas Class members, seek costs and attorneys' fees under Tex. Bus. & Com. Code § 17.50, and any other just and proper relief available under the Texas DTPA.

961. Texas Plaintiffs, for themselves and as representatives of the Texas Class, sent a notice and demand over sixty days before bringing suit, as specified by Tex. Bus. & Com. Code § 17.505.

**Y. Utah Causes of Action Alleged by Plaintiffs Denise Smith and Kerrie Parker ("Utah Plaintiffs")**

**COUNT I**
**BREACH OF EXPRESS WARRANTY UNDER THE UTAH UNIFORM COMMERCIAL CODE**

962. Utah Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

963. JPMS sells hair-care products, which qualify as goods under the Utah Uniform Commercial Code. Utah Code § 70A-2-105.

964. Utah Plaintiffs and the Utah Class purchased various JPMS hair-care products during the applicable Class period.

965. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that its hair-care products were not tested on animals and were cruelty free. Utah Code § 70A-2-313.

966. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. *Id.*

967. JPMS's representations were part of the basis of the bargain with Utah Plaintiffs and the Utah Class.

968. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

969. Utah Plaintiffs notified JPMS of the nonconformities in the hair-care products on December 8, 2025, which was a reasonable time after Utah Plaintiffs discovered the breach. Utah Code § 70A-2-607.

970. Because of JPMS's breach of its express warranty, Utah Plaintiffs and the Utah Class have suffered damages valued at the difference between the value of a hair-care product they received and the value of the hair-care product they were promised, in an amount to be proven at trial. Utah Code § 70A-2-714.

**COUNT II**
**UTAH CONSUMER SALES PRACTICES ACT ("Utah CSPA")**

971. Utah Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

972. Utah Plaintiffs and the Utah Class entered into a "consumer transaction" when they purchased JPMS hair-care products under Utah Code § 13-11-3.

973. JPMS is a "supplier" under Utah Code § 13-11-3.

974. Under the Utah CSPA, "[a] supplier that engages in a deceptive act or practice in connection with a consumer transaction violates this chapter, whether the deceptive act or practice occurs before, during, or after the transaction." Utah Code § 13-11-4.

975. Under the Utah CSPA "a supplier commits a deceptive act or practice if the supplier":

a. "indicates that the subject of a consumer transaction has sponsorship, approval, performance characteristics, accessories, uses, or benefits, if the subject has not";

b. "indicates that the subject of a consumer transaction is of a particular standard, quality, grade, style, or model, if the subject is not." Utah Code § 13-11-4.

976. JPMS engaged in unfair or deceptive acts or practices that violated the Utah CSPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

977. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

978. In purchasing JPMS products, Utah Plaintiffs and the Utah Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

979. Had Utah Plaintiffs and the other Utah Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

980. Utah Plaintiffs and the Utah Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

981. Utah Plaintiffs, individually and on behalf of the other Utah Class members, seek actual damages for the harm caused by JPMS's violations of the Utah CSPA as alleged herein. Utah Code § 13-11-19.

## Z. Virginia Causes of Action Alleged by Plaintiff Isabelle Salhani ("Virginia Plaintiff")

### COUNT I
### BREACH OF EXPRESS WARRANTY UNDER THE VIRGINIA UNIFORM COMMERCIAL CODE

982. Virginia Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

983. JPMS sells hair-care products, which qualify as goods under the Virginia Uniform Commercial Code. Va. Code § 8.2-105.

984. Virginia Plaintiff and the Virginia Class purchased various JPMS products during the applicable class period.

985. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly affirmed and warranted that it is a cruelty-free company, and its products were never animal tested. Va. Code § 8.2-313.

986. In connection with the sale of goods, including through representations on the products themselves, JPMS expressly warranted that it did not test on animals and/or that it was a cruelty-free company. Va. Code § 8.2-313.

987. JPMS's representations were part of the basis of the bargain with Virginia Plaintiff and the Virginia Class.

988. JPMS breached its express warranty by conducting animal tests in China in order to register and sell its products there.

989. Virginia Plaintiff notified JPMS of the nonconformities in the products on December 8, 2025, which was a reasonable time after Virginia Plaintiff discovered the breach. Va. Code § 8.2-607.

990. Because of JPMS's breach of its express warranty, Virginia Plaintiff and the Virginia Class have suffered damages valued at the difference between the value of the product they received and the value of the product they were promised, in an amount to be proven at trial. Va. Code § 8.2-714.

**COUNT II**
**VIRGINIA CONSUMER PROTECTION ACT**
**("Virginia CPA")**

991. Virginia Plaintiff realleges and incorporates by reference the allegations in the preceding paragraphs.

992. JPMS, Virginia Plaintiff, and the Virginia Class members are all "persons" under Va. Code § 59.1-198.

993. JPMS is a "supplier" under Va. Code § 59.1-198.

994. JPMS hair-care products are "goods" under Va. Code § 59.1-198.

995. Virginia Plaintiff and the Virginia Class entered into a "consumer transaction" when they purchased JPMS hair-care products under Va. Code § 59.1-198.

996. Under the Virginia CPA, "[t]he following fraudulent acts or practices committed by a supplier in connection with a consumer transaction are hereby declared unlawful":

a. "Misrepresenting the source, sponsorship, approval, or certification of goods or services";

b. "Misrepresenting that goods or services have certain quantities, characteristics, ingredients, uses, or benefits";

c. "Misrepresenting that goods or services are of a particular standard, quality, grade, style, or model." Va. Code § 59.1-200.

997. JPMS engaged in unfair or deceptive acts or practices that violated the Virginia CPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

998. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

999. In purchasing JPMS products, Virginia Plaintiff and the Virginia Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

1000. Had Virginia Plaintiff and the other Virginia Class members known they would not receive products that had never been animal tested or that they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

1001. Virginia Plaintiff and the Virginia Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

1002. Virginia Plaintiff, individually and on behalf of the other Virginia Class members, seeks the greater of $500 or actual damages for the harm caused by JPMS's violations of the Virginia CPA as alleged herein. Va. Code § 59.1-204.

1003. Virginia Plaintiff, individually and on behalf of the other Virginia Class members, seeks the greater of $1,000 or treble damages for the harm caused by JPMS's violations of the Virginia CPA as alleged herein. Va. Code § 59.1-204.

1004. Virginia Plaintiffs, individually and on behalf of the other Virginia Class members, seek costs and attorneys' fees under Va. Code § 59.1-204, and any other just and proper relief available under the Virginia DTPA.

### AA. Wisconsin Causes of Action Alleged by Plaintiffs Jake Tulogeski, Mark Geis, and Julie Dziekan ("Wisconsin Plaintiffs")

### COUNT I
### WISCONSIN UNFAIR TRADE PRACTICES ACT
### ("Wisconsin UTPA")

1005. Wisconsin Plaintiffs reallege and incorporate by reference the allegations in the preceding paragraphs.

1006. Under the Wisconsin UTPA "[n]o person firm, corporation or association, or agent or employee thereof, with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . merchandise . . . directly or indirectly, to the public for sale . . . shall make, publish, disseminate, circulate, or place before the public, or cause, directly or indirectly, to be made, published, disseminated, circulated, or placed before the public . . . or in any other way similar

or dissimilar to the foregoing, an advertisement, announcement, statement or representation of any kind to the public relating to such purchase, sale . . . of such . . . merchandise, . . . which advertisement, announcement, statement or representation contains any assertion, representation or statement of fact which is untrue, deceptive or misleading." Wis. Stat. § 100.18.

1007. JPMS engaged in unfair or deceptive acts or practices that violated the Wisconsin UTPA, as described herein, by representing that its hair-care products are cruelty free and never tested on animals when they are tested on animals, by representing that it is a cruelty-free company and that it never tests on animals when it tested on animals to sell in China, by claiming to have an exemption from animal testing in China that it did not have, and by advertising its hair-care products as not tested on animals and cruelty free with the intent to sell hair-care products that had been tested on animals.

1008. JPMS's misrepresentations that JPMS's hair-care products had never been tested on animals and were cruelty free, and that it has never tested on animals and is a cruelty-free company as set forth, were material and likely to deceive a reasonable consumer.

1009. In purchasing JPMS products, Wisconsin Plaintiffs and the Wisconsin Class relied on the misrepresentations of JPMS regarding its stance against animal testing and that its products were never tested on animals. JPMS's representations turned out not to be true because it tested on animals to sell its products in China.

1010. Had Wisconsin Plaintiffs and the other Wisconsin Class members known they would not receive products that had never been animal tested or that

they were purchasing from a company that tests on animals, they would not have purchased JPMS's hair-care products and/or paid as much for them.

1011. Wisconsin Plaintiffs and the Wisconsin Class suffered ascertainable loss caused by JPMS's misrepresentations and its concealment of and failure to disclose the use of animal testing as a company and on its products.

1012. Wisconsin Plaintiffs, individually and on behalf of the other Wisconsin Class members, seek actual damages for the harm caused by JPMS's violations of the Wisconsin UTPA as alleged herein. Wis. Stat. § 100.18.

1013. Wisconsin Plaintiffs, individually and on behalf of the other Wisconsin Class members, seek costs and attorneys' fees under Wis. Stat. § 100.18, and any other just and proper relief available under the Wisconsin UTPA.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and for members of the Class, respectfully request that the Court enter judgment in their favor and against Defendant, as follows:

A. Certification of the proposed Class, including appointment of Plaintiffs' counsel as Class Counsel and Plaintiffs as Class Representatives;

B. Costs, restitution, damages, and/or disgorgement, each in an amount to be determined;

C. Punitive damages;

D. Pre- and post-judgment interest on any amounts awarded;

E. An award of costs and attorneys' fees where authorized by law; and

F. Such other or further relief as may be appropriate.

## DEMAND FOR JURY TRIAL

Plaintiffs demand a trial by jury on all issues so triable.

Dated: February 24, 2026

Respectfully submitted,

HAGENS BERMAN SOBOL SHAPIRO LLP

By /s/ *Christopher R. Pitoun*

Christopher R. Pitoun (SBN 290235)
301 N. Lake Avenue, Suite 920
Pasadena, California 91101
Telephone: (213) 330-7150
Facsimile: (213) 330-7152
Email: christopherp@hbsslaw.com

Robert B. Carey (*pro hac vice forthcoming*)
Michella A. Kras (*pro hac vice forthcoming*)
E. Tory Beardsley (*pro hac vice forthcoming*)
HAGENS BERMAN SOBOL SHAPIRO LLP
11 West Jefferson, Suite 1000
Phoenix, Arizona 85003
Telephone: (602) 840-5900
Email: rob@hbsslaw.com
michellak@hbsslaw.com
toryb@hbsslaw.com

*Counsel for Plaintiffs*